Carolina Rubber Hose Company v. Commissioner.
Carolina Rubber Hose Co. v. Commissioner
Docket No. 5377-63.
United States Tax Court
T.C. Memo 1965-229; 1965 Tax Ct. Memo LEXIS 100; 24 T.C.M. (CCH) 1159; T.C.M. (RIA) 65229; August 25, 1965
*100 Held, the accumulation of petitioner's undistributed earnings for the years involved was not beyond the reasonable needs of its business. Held, further: Petitioner was not availed of during the years involved for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Petitioner is not liable for the accumulated earnings tax imposed by section 531 of the 1954 Code. Leon L. Rice, Jr., Box 199, Winston Salem, N.C., and Edward W. Rushton, Jr., for the petitioner. Wallace E. Whitmore, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioner's income tax for the years 1960 and 1961 in the respective amounts of $48,341.95 and $42,521.57. The only issue for decision is whether, for the taxable years in question, petitioner was availed of for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed, and is thus subject to the accumulated earnings tax imposed by section 531 of the 1954 Code. Findings of Fact Some of *101 the facts have been stipulated and are found accordingly. Petitioner is a North Carolina corporation organized in 1930, having its principal office and place of business in Salisbury, N.C. It keeps its books and files its tax returns on the accrual basis and for calendar year periods. Petitioner's Federal income tax returns for the years in question were timely filed with the district director of internal revenue, Greensboro, N.C. Petitioner is engaged in the business of manufacturing, processing, and selling rubber products, principally rubber hose for railroads, industrial hose, and rubber-covered rolls for the textile and paper-manufacturing industries. A predecessor corporation, the Paul Rubber Co., operated a plant engaged in the manufacturing of automobile tires in Salisbury, N.C., in 1920. This company became insolvent in 1924. Justus Collins, an individual of substantial wealth from Charleston, W. Va., had been a principal investor in Paul Rubber Co., and he bought the property when it was sold at public action. He continued to operate the rubber tire company, in an effort to recoup his losses, and formed the Carolina Rubber Co. for that purpose. This operation similarly lost *102 money, even though Justus Collins invested considerable amounts in an effort to provide adequate working capital. Miles J. Smith, Sr. (hereinafter referred to as Smith), began working for Carolina Rubber Co. in 1927. The then existing management was removed in 1928 on the recommendation of outside auditors, and Smith was given management control over that company at that time. Large payments on outstanding indebtedness were due, and it was decided to gradually liquidate the operation and discontinue the business. Smith thought he could operate profitably in another branch of the rubber business, so he prevailed upon Justus Collins to let him use the plant and equipment and to back him in the venture. Smith contributed $3,300 and Justus Collins invested $3,000, and stock in petitioner, a new corporation, was issued 207 shares to Smith and 189 shares to Justus Collins. Justus Collins leased the assets to petitioner; Smith discarded the tire business and concentrated on the manufacture of rubber hose for use by railroads on connections between boxcars and airbrakes. Petitioner purchased the land, plant, and equipment used in its business from Justus Collins in 1932, paying $10,000 for *103 the equipment and $11,000 for the land and building. Although initial profits were small, petitioner nevertheless earned money every year from the beginning of the operation and has paid a dividend every year since 1932. Justus Collins died in 1934. The stock in petitioner owned by Justus Collins at the time of his death was placed in trust (hereinafter referred to as the trust) pursuant to the terms of his will. George R. Collins (hereinafter referred to as Collins), the son of Justus Collins, was one of two trustees appointed in the will, and he served in this capacity until his death in 1964. Lamar Epperly was the other trustee appointed in the will, but he resigned in 1957 and was replaced by the National Bank of Commerce of Charleston, W. Va. (hereinafter referred to as the bank). The will required the trustees to retain 20 percent of the annual net income of the trust and add it to the trust principal. Of the remaining 80 percent of the net income, the sum of $3,000 per year was required to be paid to Phyllis Waters (deceased, 1964) and the remaining net income was to be paid equally to Collins and Amy C. Venable. Upon the death of Phyllis Waters the trust was to terminate and *104 the corpus was to be distributed in equal shares to Amy C. Venable and Collins. During the years involved, the named trust beneficiaries resided in West Virginia, with the exception of Amy C. Venable who resided in Florida. Collins died shortly after the death of Phyllis Waters in 1964. The capital of petitioner was increased to $8,300 in 1933 (with the ratio of stock ownership remaining the same), and in 1936 capital was increased further to $39,600. With the exception of preferred stock having an aggregate par value of $12,000, which was issued in 1933 and retired in 1949, petitioner's issued and outstanding capital stock from the year 1937 through 1961 has been common stock having a par value of $100 per share, held as follows: Number
Total
Owner
of shares
par value
Smith
207
$20,700
Collins trust
189
18,900
Total
396
$39,600 In December 1962 the charter of petitioner was amended to authorize the issuance of 14,500 shares of class B nonvoting common stock, par value $100 per share, following which the board of directors of petitioner declared a stock dividend of 30 shares of class B stock for each share of old common stock outstanding. Pursuant to this declaration, 11,880 shares of class B stock *105 were issued on December 27, 1962, thus increasing the capital stock account from $39,600 to $1,227,600. Incident to this stock dividend, the sum of $1,188,000 was transferred from the surplus account to the capital account on the books of petitioner. Upon the death of Phyllis Waters in 1964 the trust was terminated and the stock of petitioner held by the trust was distributed one-half to Amy Venable and one-half to the estate of George Collins, whose principal beneficiary is Virginia Military Institute. From the inception of petitioner's corporate life, Smith was the officer principally in charge of the business of petitioner. During 1960 and 1961 he held the positions of chairman of the board of directors and treasurer. His son, Miles J. Smith, Jr., was president, having come with the company in 1950 and assumed the presidency in 1959. Another son, Robert, had been employed since 1959, but was not an officer. Other officers included Collins, a vice president (inactive), David B. Davis, a vice president, and Elizabeth K. Wilburn, secretary. The board of directors consisted in 1960 of Smith, his wife, and Elizabeth Wilburn. In 1961, Smith, Junior, replaced his mother. Smith, in the *106 final analysis, made the policy decisions for the company as to dividends and retention of earnings. He personally wrote the corporate minutes. Smith was determined that petitioner would never suffer under the indebtedness that had plagued petitioner's two predecessor corporations and that petitioner would finance its expansion out of earnings. With the exception of two instances early in the life of petitioner, when Smith loaned it small amounts temporarily to meet payrolls, there has never been any reliance on debt for expansion or operation of petitioner's business. This no-borrowing policy was well known to the trustees of the trust, who always understood that the company would pay cash to meet its business needs. The trustees of the trust were kept fully informed as to the business of petitioner in general, its profits, and capital needs. Beginning in 1936 certified audit reports were sent to the trustees annually, usually accompanied by a letter from Smith discussing the business posture of the company. The trust officer of the corporate trustee and Collins regularly attended the annual meetinsg of stockholders, which were not merely formal meetings but involved discussions of *107 the business, its needs and plans, and often a tour of the plant. Smith's philosophy with respect to payment of dividends by petitioner was that consideration should be given both to the needs of the beneficiaries of the Collins trust and to the needs for retention of earnings for use in the business. While he was not specifically aware of the income of the beneficiaries he was cognizant of the responsibilities of the trustees acting in a fiduciary capacity. The general attitude of the trustees about the dividends paid by petitioner was that they were pleased with the dividends and should pursue a handsoff policy while the company was enjoying success. The accumulated earnings tax was not discussed between management of petitioner and the trustees prior to the time it was raised by respondent's agents. Petitioner served many of the largest railroads in the United States and the rubber hose business was quite successful for many years. However, as improvements were made in equipment used by the railroads to carry steam to heat passenger cars, and as the railroads became dieselized and no longer needed rubber hose to carry water from the tender to the locomotive, and as the railroad *108 business declined generally it became apparent that the demand for use of petitioner's rubber hose in the railroad industry would decrease. Smith was aware of this problem and desired to have petitioner begin making industrial hose for other uses and braided rubber hose. Petitioner was also one of the first large processors of rubber roll covering in the southeast. The rubber roll business involves the removal of an old rubber covering from a customer's cylinder or roll, similar to the squeeze rolls on a washing machine but on a much larger scale. Such rolls are used by many industries, but as far as petitioner is concerned, mainly by the textile and paper industries. In general, the rolls used by textile manufacturers are smaller than those used in the paper-manufacturing industry. The average roll used in the textile industry would be less than 1,000 pounds, whereas rolls used in the papermaking industry could weigh as much as 40 tons each. Petitioner was in a position to handle rolls weighing up to 11,000 pounds but not the larger rolls generally used in papermills. Competitors began moving into petitioner's business area in the early 1940's and on an increasing scale in the 1950's, *109 the latter movement being motivated primarily by the fact that large papermills were being constructed in the southeast area. Many of these competitors were considerably larger than petitioner and some of them competed in both the rubber hose and rubber roll business. Smith also realized the need to meet this competition if petitioner was to stay in business and as early as 1954 he mentioned this need to petitioner's directors and stockholders, as reflected in minutes of their meetings. Much of petitioner's plant and equipment was old and becoming obsolete prior to the years here involved, some of it having been original equipment acquired at a very low cost from Justus Collins. Consequently, petitioner's depreciation reserves were wholly inadequate to replace this plant and equipment. Petitioner's management had changing thoughts with respect to the best means of expanding its operations to meet competition and changing conditions throughout the 1950's and early 1960's. It was originally thought that a branch plant should be established in South Carolina, principally for the processing of rubber rolls for the textile industry, in order to be closer to its customers. Efforts were made *110 beginning in 1954 to acquire a suitable location and plant in the Greenville, S.C., area, but without immediate success. These continued until December 1964, just prior to the trial of this case, at which time petitioner purchased an 18-acre tract in Greenville County near Greer, S.C., for $35,000. It was also recognized by management during this period that petitioner would have to modernize its plant and equipment at Salisbury and enlarge its office building. In 1957 the directors adopted a resolution to set aside $750,000 to cover the cost of modernizing the Salisbury plant and constructing a new plant in South Carolina. As the papermill industry moved south, petitioner's management felt that it would be wiser to construct a plant in South Carolina that would process rubber rolls for both the textile industry and the papermills, and that it would be better to do this all at one time rather than piecemeal. In a letter to the stockholders prior to the annual meeting in April 1960, Smith estimated that the cost of such a plant would be $1 million. By November 1960, however, Smith had discovered that because of the expensive equipment required, the cost of establishing a papermill roll *111 plant would be considerably above his previous estimate and would cost "perhaps more than the Company's retained earnings over the 30 year period." At that time it was decided that rather than go directly into the papermill roll business at that time, petitioner should modernize and expand its plant at Salisbury, continue its efforts to establish a plant in South Carolina for processing rolls for the textile industry, thus expanding into the new territory one step at a time, and invest some of its funds in Raybestos-Manhattan Co., a large processor of papermill rolls with plants in the southeast, which would permit petitioner to participate, through stock ownership at least, in the papermill roll business, until it could enter the business itself. Thereafter, by authority of its board of directors and stockholders, petitioner purchased some stock in Raybestos-Manhattan Co. and in another similar corporation. Steps taken by petitioner in an effort to bring the new plant into realization included: Investigation of a building offered for sale in Greenville, S.C., in 1955; efforts to buy a building from Southern Railway Co. at Spencer, N.C., in 1960; preparation of a survey by the State *112 Development Board of South Carolina at the request of petitioner made prior to August 1962, with a view to determining available locations in the vicinity of Greenville; and negotiations for and an offer to purchase for $100,000 property at the Donaldson Air Force Base, near Greenville, in early 1964. Petitioner's Salisbury plant had been expanded numerous times prior to 1960. In 1960, in line with its plans to fill out its line of industrial hose, principally the addition of braided hose, the plant was enlarged further, leaving the backwall temporary for further additions to the building. Petitioner planned further enlargement of the plant for the braided hose operation which, together with the machinery, was estimated to cost about $250,000 as of the end of 1961. A complete switch to braided hose for the railroad industry would involve scrapping most of petitioner's machinery used to make rubber hose for this industry. Actual construction of the addition to the Salisbury plant was begun in 1962 and was completed in June 1963 at a cost of about $61,500. The cost of machinery and equipment purchased and ordered up to the date of the hearing herein was about $65,000. The original estimate *113 of equipping this plant with new machinery for the manufacture of braided hose had been revised upward to about $347,000 at that time. The size of petitioner's offices was doubled at a cost of about $43,000 in 1963. At the annual meeting of stockholders in April 1960, petitioner's management was authorized to negotiate a pension plan for its employees. Such a pension plan was adopted in 1962 which involved an unfunded past service liability at the end of 1962 of about $111,000. During 1960 and 1961 petitioner had no specific or detailed plans for a new plant. It had no architectural drawings and no definite estimates of what such a plant would cost. After respondent's agent discussed imposition of the accumulated earnings tax with petitioner's management in the latter part of 1962 petitioner secured a building estimate of about $895,000 and, with quotations for equipment already on hand and estimates for the balance of equipment needed, gave respondent's agent a total estimate of about $2,525,000 for a complete new roll plant. The following schedule shows petitioner's (1) annual net income after taxes, (2) cash dividends paid on common stock, (3) dividends as a percentage of net income, *114 and (4) net increase (or decrease) in fixed assets for the years 1936 to 1963, inclusive: (4)
(1)
(2)
(3)
Increase (decrease)
Year
Net income
Dividends
Percent
in fixed assets
1936
$ 45,194.28
$ 40,216
88.98
$ 2,350.00
1937
26,434.99
24,794
93.79
2,438.65
1938
20,076.56
19,800
98.62
2,154.87
1939
21,777.32
9,900
45.46
13,253.68
1940
11,608.05
9,900
85.29
4,540.78
1941
24,246.74
9,900
40.83
1,366.73
1942
21,991.83
9,900
45.02
25.00
1943
20,041.31
9,900
49.40
6,636.75
1944
30,308.28
19,800
65.33
(1,265.02)
1945
28,859.65
19,800
68.61
(750.00)
1946
51,220.20
36,432
71.12
6,001.34
1947
66,422.10
48,708
73.33
6,381.18
1948
117,061.41
82,368
70.36
6,832.04
1949
98,421.69
59,400
60.35
20,119.19
1950
125,111.31
69,300
55.39
22,763.85
1951
105,560.98
49,500
46.89
6,197.58
1952
115,976.41
49,500
42.68
33,093.92
1953
119,338.82
49,500
41.48
6,205.88
1954
174,754.02
49,500
28.33
36,335.24
1955
191,020.21
49,500
25.91
43,176.10
1956
155,752.45
49,500
31.78
5,476.52
1957
162,767.24
49,500
30.41
25,689.63
1958
139,642.60
49,500
35.45
6,370.70
1959
223,038.46
59,400
26.63
41,919.42
1960
213,568.89
59,400
27.81
59,124.83
1961
202,787.35
59,400
29.29
62,005.38
1962
196,148.85
110,484
56.33
(11,810.18) [1]
1963
228,923.79
110,484
48.26
106,890.09
The *115 following schedule reflects for the years indicated petitioner's (1) accumulated surplus at the end of the year, (2) increase (or decrease) of surplus during the year, (3) working capital at yearend, and (4) ratio of current assets to current liabilities at yearend: (2)
(3)
(4)
(1)
Increase
Working
Current
Year
Surplus
(decrease)
capital
ratio
1935
$ 36,058.84
$ 39,553.34
6.3:1
1936
40,678.58
$ 4,619.74
66,270.63
5.4:1
1937
41,876.04
1,197.46
75,057.54
10.4:1
1938
41,694.23
(181.81)
75,619.06
12.6:1
1939
53,102.00
11,407.77
76,190.76
4.7:1
1940
53,725.59
623.59
75,097.56
11.9:1
1941
68,341.88
14,616.29
90,414.53
3.7:1
1942
80,433.71
12,091.83
105,105.20
9.0:1
1943
90,137.52
9,703.81
109,652.47
5.6:1
1944
100,645.80
10,508.28
122,357.03
3.4:1
1945
109,330.45
8,684.65
133,930.15
3.9:1
1946
124,118.65
14,788.20
145,664.22
3.7:1
1947
141,832.75
17,714.10
160,860.48
3.3:1
1948
176,526.16
34,693.41
192,745.09
2.7:1
1949
215,547.85
39,021.69
203,302.32
3.0:1
1950
271,359.16
55,811.31
241,785.48
2.5:1
1951
327,420.14
56,060.98
298,712.23
2.3:1
1952
393,896.55
66,476.41
341,982.19
2.2:1
1953
463,735.37
69,838.82
414,578.86
2.5:1
1954
588,989.39
125,254.02
514,918.67
3.2:1
1955
730,509.60
141,520.21
632,554.70
3.7:1
1956
836,762.05
106,252.45
758,769.31
5.0:1
1957
950,029.29
113,267.24
868,353.01
5.7:1
1958
1,040,171.89
90,142.60
980,566.29
7.2:1
1959
1,203,810.35
163,638.46
1,129,743.60
4.8:1
1960
1,367,409.10
163,598.75
1,229,410.36
6.4:1
1961
1,510,796.45
143,387.35
1,337,043.84
7.0:1
1962 [1]
410,162.56
(1,100,633.89)
1,407,565.19
5.0:1
1963
528,602.35
118,439.79
1,445,647.22
5.9:1
*116 The following reflects a condensed computation of petitioner's net profits for the years 1957 through 1963: 1957
1958
1959
1960
Net sales
$1,212,522.35
$1,112,410.95
$1,723,672.48
$1,571,950.62
Cost of Goods Sold
723,910.99
690,794.22
1,064,455.44
951,730.43
Gross Profit
$ 488,611.36
$ 421,616.73
$ 659,217.04
$ 620,220.19
Selling Expense
24,557.71
24,660.77
34,724.13
33,661.16
Administrative
88,991.22
85,638.74
113,364.99
121,588.93
Expense
Total Operating
$ 113,548.93
$ 110,299.51
$ 148,089.12
$ 155,250.09
Expense
Net Operating Profit
375,062.43
311,317.22
511,127.92
464,970.10
Other Expense Less
26,644.65
14,270.52
29,319.01
10,102.50
Other Income
Net Profit Before
$ 348,417.78
$ 297,046.70
$ 481,808.91
$ 454,867.60
Income Taxes
Income Taxes
185,650.54
157,404.10
258,770.45
241,298.71
Net Profit for the
$ 162,767.24
$ 139,642.60
$ 223,038.46
$ 213,568.89
Year
1961
1962
1963
Net sales
$1,418,878.85
$1,709,893.86
$1,931,875.74
Cost of Goods Sold
830,708.94
994,966.36
1,229,203.68
Gross Profit
$ 588,169.91
$ 714,927.50
$ 702,672.06
Selling Expense
25,801.40
27,806.98
36,020.95
Administrative
119,910.90
206,410.73
170,733.79
Expense
Total Operating
$ 145,712.30
$ 234,217.71
$ 206,754.74
Expense
Net Operating Profit
442,457.61
480,709.79
495,917.32
Other Expense Less
12,686.56
13,677.07
7,929.21
Other Income
Net Profit Before
$ 429,771.05
$ 467,032.72
$ 487,988.11
Income Taxes
Income Taxes
226,983.70
270,883.87
259,064.32
Net Profit for the
$ 202,787.35
$ 196,148.85
$ 228,923.79
Year
*117 Condensed balance sheets of petitioner as of the end of each of the years 1957 through 1963 were as follows: 12/31/57
12/31/58
12/31/59
12/31/60
Assets
Cash
$ 682,546.68
$ 746,180.15
$ 677,616.65
$ 720,028.34
Accounts Receivable
79,035.52
109,422.44
148,682.14
82,045.10
(Net)
Inventories
86,800.28
80,506.08
98,678.98
111,390.22
Certificate of
Deposit - Wachovia
Bank
Government Bonds and
204,279.10
203,763.13
499,795.77
508,683.50
Building & Loan
Investments -
34,430.80
Securities
Total Current Assets
$1,052,661.58
$1,139,871.80
$1,424,773.54
$1,456,577.96
Fixed Assets
271,690.19
278,060.89
319,980.31
379,105.14
Deferred Charges
2,534.25
2,076.26
2,363.08
3,563.44
Total Assets
$1,326,886.02
$1,420,008.95
$1,747,116.93
$1,839,246.54
Liabilities, Capital
$ 184,308.57
$ 159,305.51
$ 295,029.94
$ 227,167.60
and Earned Surplus
Current Liabilities
Reserve for
152,948.16
180,931.55
208,676.64
205,069.84
Depreciation
Reserve for
Investment Tax Credit
Common Stock
39,600.00
39,600.00
39,600.00
39,600.00
Earned Surplus
950,029.29
1,040,171.89
1,203,810.35
1,367,409.10
Total Liabilities,
$1,326,886.02
$1,420,008.95
$1,747,116.93
$1,839,246.54
Capital and Earned
Surplus
12/31/61
12/31/62
12/31/63
Assets
Cash
$ 599,681.08
$ 758,068.68
$ 580,003.93
Accounts Receivable
126,383.88
123,477.89
222,631.71
(Net)
Inventories
186,164.82
116,658.26
167,260.07
Certificate of
100,000.00
100,000.00
Deposit - Wachovia
Bank
Government Bonds and
614,266.00
611,599.48
616,021.38
Building & Loan
Investments -
34,430.80
52,751.25
52,751.25
Securities
Total Current Assets
$1,560,926.58
$1,762,555.56
$1,738,668.34
Fixed Assets
441,110.52
429,300.34
536,190.43
Deferred Charges
2,848.58
2,555.35
3,080.57
Total Assets
$2,004,885.68
$2,194,411.25
$2,277,939.34
Liabilities, Capital
$ 223,882.74
$ 354,990.37
$ 293,021.12
and Earned Surplus
Current Liabilities
Reserve for
230,606.49
200,053.15
225,032.84
Depreciation
Reserve for
1,605.17
3,683.03
Investment Tax Credit
Common Stock
39,600.00
1,227,600.00
1,227,600.00
Earned Surplus
1,510,796.45
410,162.56
528,602.35
Total Liabilities,
$2,004,885.68
$2,194,411.25
$2,277,939.34
Capital and Earned
Surplus
The *118 following schedule reflects petitioner's net liquid assets on the dates indicated: 12/31/57
12/31/58
12/31/59
12/31/60
Total Current Assets
$1,052,661.58
$1,139,871.80
$1,424,773.54
$1,456,577.96
Less: Accounts Receivable
79,035.52
109,422.44
148,682.14
82,045.10
(net)
Inventories
86,800.28
80,506.08
98,678.98
111,390.22
Current Liabilities
184,308.57
159,305.51
295,029.94
227,167.60
Net Liquid Assets
702,517.21
790,637.77
882,382.48
1,035,975.04
12/31/61
12/31/62
12/31/63
Total Current Assets
$1,560,926.58
$1,762,555.56
$1,738,668.34
Less: Accounts Receivable
126,383.88
123,477.89
222,631.71
(net)
Inventories
186,164.82
116,658.26
167,260.07
Current Liabilities
223,882.74
354,990.37
293,021.12
Net Liquid Assets
1,024,495.14
1,167,429.04
1,055,755.44
Petitioner has never made loans to any of its officers, directors, or stockholders; it maintained no vacation cottage or private plane; owned only one company automobile, used by the officers; maintained a maximum of $5,000 in group life insurance; and travel and entertainment expenses and salaries of its officers were not high for a company of this size. In deference to the interests of the Collins trust, Smith, Senior, informed Smith, Junior, that the policy of the company was to deal *119 carefully in the matters of business expenditures, and not to get out of line or do anything for personal benefit, since this was not just another stockholder, but a trust. Prior to 1962 Smith, Senior, received a bonus based on the earnings of the company during the current year before taxes, which was computed by petitioner's accountants soon after the end of the year and was included in Smith's income for the current year for tax purposes. Upon the advice of petitioner's accountant, for the year 1962 Smith's bonus was computed later and was not included in his income for 1962, although petitioner, on the accrual basis, deducted the bonus for 1962. At the time the accountant made the recommendation he did not know that petitioner had raised its dividend; it was made to avoid having to complete the audit of petitioner's accounts so early in the year. In the course of an examination of petitioner's income tax returns for 1958 and 1959 an agent of respondent discussed with petitioner's management the possible application of the accumulated earnings tax, but upon being advised that petitioner needed those and prior years' earnings for extensive equipment replacement and to expand its *120 plant at Salisbury, assertion of the surtax was not recommended. Prior to issuance of the notice of deficiency for the years here involved, pursuant to section 534 of the 1954 Code, respondent sent petitioner a letter dated April 12, 1963, advising that he proposed to issue a notice of deficiency for the years 1960 and 1961 setting forth an amount with respect to the accumulated earnings tax. Pursuant to section 534 of the Code, petitioner timely filed a statement of the grounds, together with facts to show the basis thereof, upon which petitioner relied to establish that no part of its earnings for the years 1960 and 1961 had been permitted to accumulate beyond the reasonable needs of the business. The grounds claimed by petitioner were as follows: 1. Plans for a new plant, an itemized estimate of the cost of which was attached totaling about $2,525,000. 2. Plant and office expansion at Salisbury, estimated to cost $250,000 for the plant and machinery, and $41,000 for the office. 3. Dividend record and increases in fixed assets. 4. Ratio of current assets to current liabilities and need for working capital, for which no amount was stated. 5. Minority stock interest in trust. 6. Other *121 factors: (a) Recapitalization - $1,188,000. (b) Pension plan - cost in 1962, $65,000. (c) No loans to officers or stockholders. (d) Hazards of the business - decline in railroad hose business requiring conversion to rubber roll business. (e) Need for funds to make advantageous purchases of raw materials. Thereafter, respondent mailed to petitioner a statutory notice of deficiency wherein he determined that petitioner was liable for the tax imposed by section 531 with respect to the entire amount of its accumulated taxable income for each of the years 1960 and 1961. If petitioner had distributed all of its net earnings (after taxes and dividend distributions) to its shareholders as dividends, additional dividend income would have been received as follows: Miles J.
Justus Collins
Year
Smith, Sr.
trust
Total
1960
$ 79,274.59
$ 72,389.06
$151,663.65
1961
72,754.89
66,435.64
139,190.53
Total
$152,029.48
$138,824.70
$290,854.18 Of the amounts of additional income shown for the trust, approximately 20 percent thereof would have been taxable to the trust and [of] the remaining approximately 80 percent would have been taxable equally to the principal trust beneficiaries, George R. Collins and Amy Venable. If *122 such dividend distributions had been made by petitioner, the increases in taxable income for the trust, Collins, and Amy Venable would have been as follows (there would be no further distributions to the lifetime beneficiary and thus no taxable income increase or tax increase): Increase in taxable income [1]
Taxpayer
1960
1961
Total
Justus Collins trust
$13,118.42
$12,118.87
$25,237.29
George R. Collins
28,732.38
26,319.58
55,051.96
Amy C. Venable
28,732.38
26,319.58
44,051.96
If petitioner had distributed all of its net earnings (after taxes and dividend distributions) the Federal income tax payable by each of the distributees or recipients thereof would have been increased as follows: Increase in Federal income tax [1]
Taxpayer
1960
1961
Total
Miles J. Smith
$60,129.00
$54,968.61
$115,097.16
Justus Collins trust
6,737.34
5,979.28
12,716.62
George R. Collins
23,025.25
20,026.80
43,052.05
Amy C. Venable
20,499.21
17,698.32
38,197.53
Ultimate Findings Petitioner's earnings and profits were not permitted to accumulate beyond the reasonable needs of its business during the years 1960 and 1961. Petitioner was not availed of in the years 1960 and 1961 for the purpose of avoiding the income tax with *123 respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. Opinion The only issue is whether during the years 1960 and 1961 petitioner was availed of for the purpose of avoiding income tax to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed, so as to be liable for the accumulated earnings tax imposed by section 531 of the 1954 Code. [2] *124 While the following related sections of the Code lay down rules for determining the applicability of the tax, the basic requirement for application of the tax is set forth in section 532, [3] being that the corporation was used as a means of avoiding income tax to its shareholders by accumulating all or a part of its current year's earnings instead of distributing them to its shareholders. This basic concept must be kept clearly in mind when approaching the issue before us. Were the subjective intent or purpose of petitioner's management in not distributing all of petitioner's profits for the years involved alone determinative of the issue we would not have too much difficulty in deciding this issue for petitioner, for reasons hereinafter discussed. But section 533[4] establishes a more objective test by providing that the fact that earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business *125 shall be determinative of the proscribed purpose unless the corporation by the preponderance of the evidence shall prove to the contrary. Consequently we must first determine whether petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of the business. In deciding this question we may take into consideration the reasonably anticipated needs of the business, section 537, and we must also consider whether the earnings and profits of petitioner accumulated in years prior to 1960 and 1961 were sufficient to meet the reasonable needs of petitioner's business. Sec. 1.535-3(b)(1)(ii), Income Tax Regs. ; Bremerton Sun Publishing Co., 44 T.C. 466 (July 16, 1965). Section 534(a)[5] *127 provides that if the notice of *126 deficiency issued by the Commissioner is based in whole or in part on the allegation that taxpayer's earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall be on the Commissioner unless he sends the taxpayer the notice provided in subsection (b). [6]Section 534(a) also provides that if the taxpayer has submitted the statement described in subsection (c) the burden of proof with respect to the grounds set forth in such statement shall also be on the Commissioner. Section 534(c)[7] *128 provides that upon receipt of the above notice from the Commissioner the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which taxpayer relies to establish that its earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. Here, respondent sent the prescribed notice to petitioner and petitioner timely filed a statement setting forth the grounds upon which it relied. The grounds set forth by petitioner are summarized in our findings of fact. Some of them go directly to support of petitioner's position that earnings were retained to meet the reasonable needs of the business by showing what those needs were, such as building a new rubber roll plant, modernizing and equipping its existing Salisbury plant and office, need for working capital, requirements to fund past service benefits for a pension plan, and reserves for equipment replacement and advantageous purchases of raw materials; while other grounds stated, such as the dividend record, the plans for recapitalization, and the minority interest being held by a trust, while indirectly supporting *129 the business need for accumulating earnings, more directly support petitioner's argument on the basic issue that its earnings were not accumulated for the purpose of avoiding tax to its shareholders. Respondent claims that the facts set forth by petitioner in its statement of grounds were not sufficient to shift the burden of proof to him on the grounds set forth. Petitioner's statement was of considerable length and detail, with exhibits attached, and we think it clearly stated facts sufficient to show the basis for the grounds upon which petitioner now primarily relies, being the need for a new plant and for modernizing, expanding, and replacing equipment in its existing plant and office at Salisbury. We believe that the burden of proof rests on respondent with respect to the latter grounds. However, it is unnecessary to rely on the burden of proof to decide this question because we believe we have all the pertinent facts in the record on which the question should be decided. The question of whether 1960 and 1961 earnings were accumulated to meet the reasonable needs of petitioner's business, including reasonably anticipated needs, was narrowed at the hearing of this case, and also *130 in petitioner's briefs. Smith testified to the effect that petitioner had, at the beginning of 1960, resources sufficient to meet its normal business requirements, exclusive of cash needed for the new rubber roll plant and for modernizing, enlarging, and equipping the Salisbury plant; and on brief petitioner essentially acknowledges this to be a fact. Of course this does not eliminate the need for determining whether prior accumulated earnings, in the form of available funds, were more than sufficient to meet petitioner's normal business requirements so that a part thereof could be used to meet these anticipated needs. See sec. 1.535-3(b)(1)(ii), Income Tax Regs.
It appears to us that this question of the reasonable needs of the business boils down to the question whether petitioner actually intends to use its accumulated earnings to build a new plant and to further expand and modernize its plant at Salisbury; and whether it insists on using only accumulated earnings for this purpose. If it does, it seems to us there can be little doubt that it will require all of its liquid assets accumulated prior to 1960 as well as its undistributed earnings for 1960 and 1961 to accomplish this *131 purpose and at the same time keep enough cash on hand to meet its normal operating requirements. Petitioner's earned surplus at the beginning of 1960 was $1,203,810.35, and it added to that surplus $163,598.75 in 1960 and $143,387.35 in 1961, making a total of $1,510,796.45 in earned surplus at the end of 1961. On the other hand, its net liquid assets (current assets less accounts receivable, inventories, and current liabilities) totaled $882,382.48 at the beginning of 1960, $1,035,975.04 at the end of 1960, and $1,024,495.14 at the end of 1961. The net liquid assets had increased some but not much by the end of 1963. We believe petitioner's liquid position is of more importance that its earned surplus if we accept the premise that petitioner was accumulating earnings with which to build the new plant and expand the old one. To the extent that surplus has been translated into plant expansion or other assets related to its business, a corporation may accumulate surplus with impunity. Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495, affirming a Memorandum Opinion of this Court, certiorari denied 362 U.S. 976, rehearing denied 363 U.S. 832. Petitioner's evidence, based *132 to a large extent on quotations for a new building and for new equipment for a rubber roll plant, estimated that the total cost of a new roll plant would be about $2 1/2 million. Petitioner's evidence also shows that as of the beginning of 1960 petitioner estimated the cost of expanding and modernizing the Salisbury plant and office at $291,000; and that estimate was raised prior to the trial when consideration was given to obtaining new equipment for making braided hose. During the period from 1960 to the date of the hearing in this case petitioner expended about $285,000 for additions to the Salisbury plant and office, purchases of new equipment, and replacement of old equipment. There can be little question that these expenditures were reasonably anticipated needs of the business. Respondent offered no evidence to contradict petitioner's figures, other than evidence that petitioner had long followed the custom of buying used equipment when possible and using its equipment longer than usual. While we think petitioner's figures are somewhat exaggerated over what its management could reasonably have anticipated in 1960 and 1961 that it would spend on a new roll plant, even if the new *133 plant figure were cut in half and added to the estimated cost of improving the Salisbury plant, and leaving some liquid assets to meet the ordinary operating cost of the business, it is obvious that as of 1960 petitioner needed to accumuate additional earnings to meet these needs alone, if such they can be classified. Respondent relies on petitioner's failure to take definite steps and make any specific plans to build a new plant, to prove that the building of a new roll plant does not qualify as a reasonably anticipated need of petitioner's business during the years here involved. Respondent's regulations, section 1.537-1(b)(1), provide: In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon *134 all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. This regulation finds support in the legislative history of section 537 of the 1954 Code, see S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 68, 69, and appears to be a reasonable interpretation of the statute. The point raised by the above language has also given us the most trouble in deciding the question under consideration. However, viewing the record as a whole, we do not find that petitioner's plans with respect to a new plant were so uncertain or vague as to be disqualified as a reasonably anticipated need of the business even under the language of the regulation. We do not view this as a case where the plans of implementation were so indefinite that they were not within the reasonably calculable future. Cf. Barrow Manufacturing Company v. Commissioner, 294 F. 2d 79, affirming a Memorandum *135 Opinion of this Court, certiorari denied 369 U.S. 817. On the contrary, the testimony of Smith was to the effect that he had long recognized the importance of petitioner building an additional plant south of Salisbury and going into the rubber roll business for papermills, that he has been actively investigating possible plant locations since 1954, that a suitable plant site has recently been purchased, and that management has placed most of the retained earnings in 1-year Government obligations in an effort to earn interest and still retain liquidity for the purpose of having funds readily available for financing the expansion. The minutes of the stockholders and directors meetings throughout the years, and the testimony of the corporate trustee's representative, bear this out. The delay in implementation of the expansion plans was attributed to several factors. One reason was the large accumulation required to meet the high cost of the plant and equipment. Smith realized that the new plant and equipment would require a substantial capital outlay, and he was hesitant to proceed on a piecemeal basis. It is not always possible for a company to set aside a specific sum in advance to *136 achieve a specific goal. John P. Scripps Newspapers, 44 T.C. 453. On the other hand, it has been recognized that there are several methods of financing available to corporations and one legitimate method is to accumulate earnings and profits until the expansion can be timely undertaken. Crawford County Printing & Publishing Co., 17 T.C. 1404. We do not understand that the accumulated earnings tax provision of the Code, in the absence of an ulterior purpose, prevent a corporate taxpayer from making a reasonable accumulation to finance expansion and modernization out of its own funds rather than borrowing. General Smelting Co., 4 T.C. 313. In the instant case management of petitioner recognized the need for expansion and diversification, they planned to construct a new plant, and they actively engaged in conduct to that end. We certainly cannot say that the need for diversification and expansion was not justified in this case. Despite the fact that petitioner continued to have a rather amazing earnings record in the light of the capital it employed, the record is replete with indicia that it may soon have to modernize and diversify in order to compete. We would always be reluctant *137 to substitute our judgment for that of management on questions such as this, Breitfeller Sales, Inc., 28 T.C. 1164; James M. Pierce Corporation, 38 T.C. 643, reversed on other grounds 326 F. 2d 67; and this is a case in which that judgment is amply supported by the record. The delay in actually implementing these plans is troublesome and were it not for the history of very conservative management of this company, as indicated by the record, and the fact that a large minority interest in the company was owned by a trust, we would be more reluctant to accept petitioner's evidence as proof that these accumulations of earnings were truly being made to meet the reasonably anticipated needs of the business. But in the light of the records as a whole we accept petitioner's evidence that its undistributed earnings for 1960 and 1961 were accumulated to help finance a new plant, expansion of the Salisbury plant, a pension plan, and other business requirements, all of which we consider to be reasonably anticipated needs of petitioner's business for the years here involved. Further developments may prove us wrong, but subsequent years must be viewed in the light of facts then established, and *138 we are concerned here only with the years 1960 and 1961. Breitfeller Sales, Inc., supra. Having decided that petitioner's earnings and profits were not, during the years involved, permitted to accumulate beyond the reasonable needs of the business, we must still determine whether petitioner was availed of during these years to avoid tax on its stockholders by permitting its earnings and profits to accumulate instead of being divided or distributed; and the burden of proof on this issue is on petitioner. Pelton Steel Casting Co., 28 T.C. 153, affd. 251 F. 2d 278, certiorari denied 356 U.S. 958; Sandy Estate Co., 43 T.C. 361. Of course a showing by petitioner that its undistributed earnings and profits for 1960 and 1961 were accumulated for reasonably anticipated needs of the business is a long step toward carrying petitioner's burden of proof. But without getting into the argument whether the tax avoidance purpose must be the sole purpose, the dominant purpose, or only one of the purposes, compare World Pub. Co. v. United States, 169 F. 2d 186, with Young Motor Co. v. Commissioner, 281 F. 2d 488, reversing 32 T.C. 1336, we find from all the evidence that tax avoidance to *139 its shareholders was not a sufficient consideration, if any, in the determination of petitioner's dividend policy in the years 1960 and 1961 to make petitioner liable for the accumulated earnings tax. We assume that any high bracket taxpayer, such as Smith who determined the dividend policy of petitioner, would subconsciously at least give some consideration to the tax impact on the shareholders of the dividends distributed, but we find no evidence that petitioner was deliberately and consciously availed of in the years involved for the proscribed purpose. As respondent points out, where subjective intent is a prime factor that must be dealt with, it is never an easy question. The Court must evaluate all testimonial indications of purpose with all the objective facts to determine what the true purpose really was. As would usually be the case, the testimony in this case refutes a tax avoidance purpose. Smith, Senior, testified that tax avoidance was never a consideration in his decisions on the dividends to be paid and that he did not even know the tax brackets of the trust beneficiaries. He testified that his decisions on dividends reflected a balance between the needs of the trust *140 beneficiaries and the needs of the business. The representative of the corporate trustee testified that while he realized that petitioner had a considerable amount of cash on hand, the tax consequences of dividend distributions were never discussed to his knowledge. While admittedly the trustees had little to do with dividend policy, we doubt that they were in a position to stand by and do nothing if tax avoidance was an obvious objective in petitioner's failure to distribute all its earnings and profits. The testimony of Smith, Junior, also confirms the above. To aid in solving this dilemma of determining subjective intent respondent's regulation 1.533-1(a)(2) sets out various criteria that should be considered in making the determination. They are: (1) Dealings between the corporation and its shareholders, such as personal loans and expenditures for the benefit of shareholders; (2) Investment in unrelated assets; and (3) The extent of earnings distributions. We find here that petitioner stands up well under each of these considerations. There is no evidence that petitioner ever made personal loans to either of its shareholders or otherwise spent corporate funds for the benefit of *141 its shareholders. Neither Smith nor his family were paid excessive salaries, nor were they allowed excessive expense accounts. The corporation did not maintain any recreational projects for the benefit of its shareholders. Petitioner did not invest its surplus in assets unrelated to its business. Its investments in Government bonds and State of North Carolina bonds were for relatively short terms and could be readily liquidated. The purpose of these investments was stated to be to earn some return on the funds while remaining liquid. Although the existence of such standby investments calls for careful scrutiny, they are not proof that the funds are not needed in the business. Sandy Estate Co., supra at 377, 378. And petitioner's investments in stock of Raybestos-Manhattan Co. and Stowe-Woodward, Inc., both of which were traded on the stock exchange, and both of which companies were competitors of petitioner, did have some relation to petitioner's business according to Smith's testimony. And, finally, petitioner's dividend record supports Smith's testimony of his dividend policy, rather than a tax avoidance motive. Petitioner paid a dividend every year of its existence, beginning *142 with 1932, ranging from a high of 98.62 percent of its net income in 1938 to a low of 25.91 percent of its net income in 1955, and averaging over the period 1936 through 1961 nearly 42 percent of its earnings. For the years 1960 and 1961 the dividends amounted to 27.81 percent and 29.29 percent of its net earnings, respectively. While in the 1950's the dividends paid represented a decreasing percentage of net earnings, the dollar amounts were the same until they were increased in 1959, and we do not think it is unusual for management to be reluctant to increase dividends until they are certain the needs of the business will permit it on a continuing basis. Whether a corporation was availed of for the purpose proscribed by section 532 is a question of fact, Helvering v. Nat. Grocery Co., 304 U.S. 282; Bremerton Sun Publishing Co., supra, and based on all the evidence before us we have concluded that petitioner was not availed of during the years 1960 and 1961 for the purpose of avoiding income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed, and hence it is not liable for the accumulated earnings tax. Decision *143 will be entered under rule 50. Footnotes
1. ↩
Fixed assets purchased in 1962
$46,456.70
Less assets fully depreciated, written off
12/31/62
58,266.88
Net decrease
$11,810.18
1. The decrease in surplus for 1962 resulted from the 30 to 1 stock dividend declared in that year, which also affected the surplus per books at the end of 1963.↩
1. These figures were stipulated.↩
2. All section references are to the Internal Revenue Code of 1954 unless otherwise noted. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27 1/2 percent of the accumulated taxable income not in excess of $100,000, plus (2) 38 1/2 percent of the accumulated taxable income in excess of $100,000. ↩
3. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531↩ shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.
4. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532↩, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.
5. SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. ↩
6. SEC. 534. BURDEN OF PROOF. * * *
(b) Notification by Secretary. - Before mailing the notice of deficiency referred to subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531↩. In the case of a notice of deficiency to which subsection (e)(2) applies and which is mailed on or before the 30th day after the date of the enactment of this sentence, the notification referred to in the preceding sentence may be mailed at any time on or before such 30th day. 7. SEC. 534. BURDEN OF PROOF. * * *
(c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.