Central Motors, Inc. v. Commissioner.
Central Motors, Inc. v. Commissioner
Docket No. 41524.
United States Tax Court
T.C. Memo 1954-122; 1954 Tax Ct. Memo LEXIS 126; 13 T.C.M. (CCH) 781; T.C.M. (RIA) 54228; August 12, 1954, Filed W. Scott Wilkinson, Esq., for the petitioner. W. B. Riley, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in petitioner's income tax for the calendar years 1947 and 1948 as follows: Year
Deficiency
1947
$44,178.15
1948
44,037.44
The issues presented for decision are as follows: Did the Commissioner err in holding: (1) That the petitioner in 1947 and 1948 was subject to surtax under section 102 of the Internal Revenue Code for improperly accumulating surplus? (2) That commissions credited to petitioner on the books of Commercial Credit Company on December 31, 1947, amounting to $2,463.66, were properly accruable and *127 constituted taxable income to petitioner for the year 1947? Two other minor adjustments in the deficiency notice are not contested by petitioner. Findings of Fact Petitioner is a Louisiana corporation with its office and place of business in Shreveport, Louisiana, and filed its returns for the taxable years with the then collector of internal revenue for the district of Louisiana on the calendar year basis. It employed the accrual method of accounting and in reporting its income. Petitioner was originally incorporated in 1929 as Robb Motor Co., Inc., but its name was changed to Central Motors, Inc., in 1931. Its business has always been that of a retail automobile dealer, engaged in buying, selling, trading and servicing automobiles, trucks, parts, equipment and accessories. Prior to August 25, 1941, petitioner operated a Studebaker automobile agency, but since that date and continuously to the hearing herein it has operated under a dealership agreement with the Dodge division of the Chrysler Corporation, having an exclusive dealer's franchise as to Dodge motor vehicles and a non-exclusive franchise as to Plymouth cars, and a non-exclusive franchise to handle parts and accessories *128 for both Dodge and Plymouth. Its sales area included Caddo, DeSoto, Bossier and Red River Parishes in Louisiana. However, on December 31, 1947, its sales area was reduced to include only the parishes of Bossier, Red River and all of Caddo except the townships of Vivian and Rodessa. S. D. Hunter, hereinafter called Hunter, organized petitioner and has always been its principal stockholder, and since 1945, its sole stockholder. Since 1932 he has been vice president and director of petitioner, but due to other business interests, [1] in which he was engaged, the management and operation of petitioner has been largely conducted by W. B. Safford, Jr., hereinafter called Safford, who, since 1932, has been president and general manager of petitioner. He received a salary plus a percentage of profits for his services to petitioner and has never owned any of its stock. Safford is about 55 years of age and knows the automobile business, having been continuously connected therewith since he was 20. Hunter, Safford and another employee of petitioner served as its board *129 of directors in the taxable years. When Safford became president and general manager in 1932, petitioner was "worse than broke." Its $20,000 capital had been dissipated and also an additional $20,000 loaned it by Hunter, and it was unable to meet its current obligations. It was about 1945 before its financial condition improved so that its business could be successfully operated. Safford's experience and ability contributed largely to its success. Except for the year 1937 petitioner has paid no dividends. Since Hunter became its sole stockholder, and including the taxable years here involved, petitioner has paid salaries and bonuses as follows: Total Executive
Total Salary &
Salaries
Year
Bonus to Hunter
& Bonuses
1945
$ 8,750.00
$26,144.37
1946
16,500.00
44,321.71
1947
21,500.00
54,243.43
1948
22,000.00
54,950.61
Petitioner does not own stock in other companies and has not engaged in the business of buying stocks and bonds for investment or for sale. Its business has always been restricted to the automobile and truck business and accessories, and it has adhered to the purposes expressed in its charter, viz: "To engage in the general *130 business of buying, selling and trading in automobiles, motor vehicles of every nature, type and description, gasoline motors, automobile equipment and accessories in the State of Louisiana and elsewhere." Petitioner's gross income, net income and net income after taxes [2] for the years 1945 to 1952, inclusive, are as follows: Year
Gross Income
Net Income
Net Income After Taxes
1945
$147,936.01
$ 51,676.26
$ 19,400.16
1946
333,353.90
183,138.76
110,823.04
1947
422,988.13
222,046.56
133,712.80
1948
453,220.06
236,399.78
142,954.38
1949
372,232.59
108,977.71
1950
355,786.76
74,680.54
1951
350,256.97
58,888.66
1952
326,689.02
14,788.06
The ratio of petitioner's current assets to its current liabilities for the years 1941 to 1948, both inclusive, were as follows: 1941
1.432 to 1
1942
1.804 to 1
1943
2.699 to 1
1944
3.09 to 1
1945
2.458 to 1
1946
1.988 to 1
1947
2.67 to 1
1948
3.03 to 1
Distribution by petitioner of its net earnings after taxes for each of the years 1947 and 1948 would have resulted in a substantial *131 surtax liability thereon for Hunter in each year. Petitioner's balance sheets for the end of each of the taxable years in question were as follows: "1947
"ASSETS
December 31, 1947
CURRENT
Cash
$267,202.77
Accts. Rec.
42,735.51
Notes Rec.
1,212.28
Accts. Pay. Dr. Bal.
Accrued Int. Rec.
Deposits
922.00
Inventories
105,110.97
$417,183.53
OTHER ASSETS
1,132.17
FIXED ASSETS
Cost
Reserve
Net Value
Land
$ 32,250.00
$ 32,250.00
Bldg. - Agurs
Trk. Service Bldg.
47,907.07
1,596.90
46,310.17
Shop Equip.
22,045.73
13,395.47
8,650.26
Office Furn. & Fix.
16,884.98
9,636.09
7,248.89
Company Cars
2,285.97
523.53
1,762.44
Total
$121,373.75
$25,151.99
$ 96,221.76
96,221.76
Total Assets
$514,537.46
"LIABILITIES AND CAPITAL
CURRENT LIABILITIES
Notes Payable
Accts. Payable
$ 18,364.57
Accts. Rec. Cr. Bal.
3,367.69
Accrued Liabilities
47,423.31
Accrued Income Taxes
88,333.76
$157,489.33
LONG TERM LIABILITIES
DEFERRED INCOME
22.85
RESERVES
1,330.00
CAPITAL
Capital Stock
20,000.00
Surplus
335,695.28
355,695.28
Total Liabilities and Capital
$514,537.46"
*132 "1948
"ASSETS
December 31, 1948
CURRENT
Cash
$339,063.45
Accts. Rec.
40,683.04
Notes Rec.
1,838.73
Accts. Pay. Dr. Bal.
232.93
Accrued Int. Rec.
Deposits
4,885.00
Inventories
134,265.13
$520,968.28
OTHER ASSETS
1,546.73
FIXED ASSETS
Cost
Reserve
Net Value
Land
$ 72,250.00
$ 72,250.00
Bldg. - Agurs
288.00
288.00
Trk. Service Bldg.
60,176.77
$ 2,677.74
57,499.03
Shop Equip.
25,342.97
16,044.49
9,298.48
Office Furn. & Fix.
19,072.88
10,516.63
8,556.25
Company Cars
3,801.13
1,675.16
2,125.97
Total
$180,931.75
$30,914.02
$150,017.73
150,017.73
Total Assets
$672,532.74
"LIABILITIES AND CAPITAL
CURRENT LIABILITIES
Notes Payable
$ 2,000.00
Accts. Payable
15,691.15
Accts. Rec. Cr. Bal.
3,030.99
Accrued Liabilities
40,415.54
Accrued Income Taxes
93,445.40
$154,583.08
LONG TERM LIABILITIES
18,000.00
DEFERRED INCOME
RESERVES
1,300.00
CAPITAL
Capital Stock
20,000.00
Surplus
478,649.66
498,649.66
Total Liabilities and Capital
$672,532.74"
Hunter was a conservative and successful business man and was a *133 director in two National Banks in Shreveport, but he largely left the management and operation of petitioner to Safford. The two would confer upon matters of major importance and Safford regularly furnished Hunter financial reports on the business. Hunter always felt that petitioner was undercapitalized, and due to this fact and also the ups and downs of the automobile business and the early reverses of petitioner's business, Hunter and Safford early adopted and continued the policy of building up cash reserves to finance current operations and to take care of plans for future improvement and expansion. Hunter was opposed to operating on borrowed capital. Petitioner's cash balances were always larger on December 31 than at any other time of the year, since by the end of the year petitioner had reduced its inventory of cars on hand to make ready for the new models. Large cash balances were necessary at the end of the year to buy new car models for the peak sales that occur after the first of the year, and particularly in the spring. During the year 1947, petitioner purchased 612 new cars and trucks at an average cost per unit of $1,358.56, or a total cost of $831,438.72. In 1948 *134 petitioner bought 538 new cars and trucks at an average cost of $1,534.17 per unit or a total cost of $825,383.46. The average monthly expenditures made by petitioner in 1947 were $114,000 and in 1948 they were $134,000. These were made in the purchase of cars, parts, salaries, etc., and were all inclusive. In 1947 and 1948, due to the expanding volume of petitioner's business and the constantly increasing price of cars and trucks, Safford estimated that petitioner would likely require in each of those years about $500,000 in cash to properly operate its business. Furthermore, in the taxable years petitioner's officers and directors had under consideration plans for expansion and improvement of its business, viz: The securing of a parts wholesale distributorship from the Chrysler Corporation for the "Ark-La-Tex" area, which would require a minimum cash capital of $250,000. This was under consideration for several years. Negotiations to secure such a franchise were begun in 1945, and formal written application was made by petitioner on December 19, 1945. Due to post war conditions, Chrysler was undecided for several years whether it wanted to establish such agency. Petitioner *135 continued its efforts to secure same and numerous oral conferences relative thereto were held with various officials of the Chrysler Corporation during the years 1946, 1947, 1948 and subsequent years. Finally, in November, 1950, the Chrysler Corporation offered a franchise to petitioner, but this offer, after deliberation and investigation, was rejected by petitioner in February, 1951, since the offer was conditioned on the creation of a separate company involving new buildings and personnel which petitioner deemed undersirable. Petitioner's principal place of business was on Market Street, and its salesroom and plant facilities were inadequate, and plans were made to enlarge same. In December, 1945, Safford wrote Dodge Motors that petitioner "has an expansion program in progress which when completed will give us 17,500 square feet more floor space." At that time petitioner had bought a lot adjoining its place of business for $32,250, which was paid for by installments in the years 1946 and 1947. During the years 1946 to 1948, inclusive, petitioner expended for buildings on this lot approximately $100,000. In 1948 petitioner's officers and directors decided to establish a truck *136 operation plant at Augurs, a suburb of Shreveport, and in November, 1948, bought for a price of $40,000 the land on which to locate same, and they estimated an additional $50,000 to $65,000 would be required to erect suitable buildings, etc., thereon. Shortly thereafter petitioner expended $30,400 in erecting a warehouse and office buildings thereon. During the taxable years, in addition to petitioner's plans for the parts wholesale distribution and for the expansion of its plant facilities, its officers recognized the desirability of accumulating sufficient cash so that petitioner could finance chattel mortgage notes given by its purchasers of automobiles and trucks, a service then being supplied by the Commercial Credit Corporation. However, petitioner did not have sufficient cash reserves to do all of these. The wholesaling of parts was deemed to be more profitable, and hence the financing project was deferred until it was known that the former could not be obtained. In 1952 petitioner did establish its own credit financing of its customers, and in order to do so it had to borrow $125,000 from a bank on its own unsecured note, since its accumulated earnings at that time were insufficient *137 to finance the venture. During the taxable years petitioner sold all notes, conditional sales contracts or chattel mortgages acquired by it from purchasers of automobiles and trucks to Commercial Credit Corporation, hereinafter called Commercial. The terms of the agreement between petitioner and Commercial provided that at the time of purchase of such notes, Commercial would set up certain reserves for the account of petitioner in accordance with an agreed schedule based primarily upon the period over which a particular note was payable, and, in addition thereto, would also set up retroactively additional reserves for the account of petitioner in accordance with an agreed schedule based upon the number of cars covered by notes purchased from petitioner during each twelve-month period. Said agreement further provided, inter alia, as follows: "* * * As of the 31st days of January, July and October we [Commercial] will pay to you [petitioner herein] the amounts by which the reserves set up for your account exceed 3% of the total balances outstanding on all Notes purchased from you, provided that no payment need be made so long as any breach exists in the performance of the terms *138 and conditions of any agreement between us." [Bracketed material supplied.] Petitioner, which otherwise reported its income on the accrual basis for the year 1947, recorded on its books during said year only the amounts actually received by it during said year from Commercial and, in the determination of its income, did not take into account the balances of the reserves set up to its account by Commercial under the above agreement. The credit balance of such reserve accounts shown due to petitioner on the books of Commercial at December 31, 1947, was $2,463.66, which amount respondent in his deficiency notice has added to petitioner's income for the year 1947. The credit balance of the reserve accounts shown due to petitioner from Commercial on December 31, 1947, was properly accruable as income by petitioner on that date. Respondent in his deficiency notice also held that petitioner was subject to a surtax under section 102 of the Internal Revenue Code for 1947 and 1948, "because you have been availed of for the purpose of preventing the imposition of surtax upon your stockholders." In 1947 and 1948 petitioner was not availed of for the purpose of *139 preventing the imposition of the surtax upon its stockholders and, further, its earnings or profits were not permitted to accumulate beyond the reasonable needs of the business. Opinion The respondent contends that the earnings and profits of petitioner in the years 1947 and 1948 were permitted to accumulate beyond the reasonable needs of the business with the result that the petitioner was availed of for the purpose of preventing the imposition of the surtax upon its sole shareholder through the medium of permitting its earnings and profits to accumulate instead of being divided and distributed. The respondent having so determined in his deficiency notice, the burden of disproving same is upon the petitioner. Furthermore, if the earnings or profits were permitted to accumulate beyond the reasonable needs of the business, such "fact shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary." See section 102(a) and (c), Internal Revenue Code. Hunter, the sole stockholder, would have incurred additional surtax liability both in 1947 and in 1948 had petitioner declared dividends *140 in those years. The issue here is purely factual to be determined from all of the evidence. Based thereon and the record as a whole, we have found as an ultimate fact that in the taxable years petitioner was not availed of for the purpose of preventing the imposition of the surtax upon its stockholder, and further, that its earnings or profits were not permitted to accumulate beyond the reasonable needs of the business. We deem it unnecessary to review the evidence since same in considerable detail is contained in our findings of fact. We shall merely point out some of its salient features and conclusions based thereon. The taxable years were not normal years in the business of petitioner. They were its "peak years" both in gross and net income throughout the 20 years of its existence. That the profits in those years were abnormal is reflected by the fact that the profits in both the preceding and subsequent years were not comparable in size. The shrinkage of profits in the subsequent years accentuates not only the abnormality of the taxable years, but also confirms Safford's testimony as to the instability and uncertainty of the automobile business. From a net income in 1948 *141 of $236,399, it shrunk to $108,977 in 1949, $74,680 in 1950, $58,888 in 1951, and $14,788 in 1952. This quick shrinkage also justifies Hunter's and Safford's conservatism in keeping the business on a cash basis and avoiding the borrowing of money in the purchase of automobiles and the operation of the business. In 1952 the Commissioner issued his deficiency notice herein, designating 1947 and 1948 only for imposition of section 102, thus indicating the absence of such violation in other years. While petitioner's earnings, profits and surplus were all large in 1947 and 1948, its need for cash in those years in the purchase of automobiles and trucks and for the operation of its business was also large and relatively increased over previous years. Safford's estimate of $500,000 in cash being required in each of these years for the purchase of cars and trucks and in the ordinary and usual operation of the business proved to be too conservative. Aside from the expenses incurred in the operation of the business, petitioner spent alone for the purchase of cars and trucks in 1947 the sum of $831,438, and in 1948, $825,383, which sums exceeded petitioner's surplus by $475,743 in 1947 and *142 by $326,734 in 1948. Furthermore, in 1947, and 1948 petitioner was spending and planning the expenditure of large sums in the expansion and improvement of its business, viz: (a) Enlargement of its building. In 1947 it finished paying $32,250 for the adjoining lot and in 1946 to 1948 it expended for buildings on this lot approximately $100,000. (b) Installation of a truck operation plant at Augurs, the lot for which was purchased in 1948 for $40,000, and it was estimated that an additional $50,000 to $65,000 would be required to erect suitable buildings thereon. (c) Parts wholesale distributorship, which would require a minimum expenditure of $250,000. Because petitioner was unable to show any correspondence in 1947 and 1948 relating to this proposed project, respondent insists that it was not being considered in those years. However, the evidence shows that numerous oral conferences were had in the taxable years with reference to this project, and petitioner for several years, including the taxable years, continued its efforts to secure a franchise for this project, and in the belief that same would be obtained, refrained from establishing its own credit agency, and finally, *143 when it was unable to secure a franchise on suitable terms, it thereafter established its credit agency for handling paper of its customers. The fact that petitioner chose to use its resources to carry on its business on a cash basis and in planning to expand same, rather than pay dividends, is a business policy to be determined only by the sagacity and discretion of petitioner's officers and directors. Cf. J. L. Goodman Furniture Co., 11 T.C. 530; General Smelting Co., 4 T.C. 313. We think the evidence clearly refutes respondent's determination that petitioner was availed of in the taxable years for the purpose of preventing the imposition of surtax upon its sole stockholder. We also hold that petitioner's earnings or profits were not permitted to accumulate beyond the reasonable needs of the business, and accordingly on this issue petitioner is sustained. On the second issue we sustain the Commissioner and hold that the commissions credited to petitioner on the books of the Commercial Credit Corporation on December 31, 1947, amounting to $2,463.66, were properly accruable and constituted taxable income to the petitioner for the year 1947. See Shoemaker-Nash, Inc., 41 B.T.A. 417.
*144 Decision will be entered under Rule 50. Footnotes
1. Hunter's net income in 1947 was $23,203.92 and in 1948 his one-half of the community net income was over $30,000.↩
2. The record fails to show "net income after taxes" for years after 1948.↩