Per Curiam:
This case was referred to Trial Commissioner W. Ney Evans with, directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on March 30, 1967. On April 26,1967, plaintiffs filed a tentative notice of intention to except to the commissioner’s findings of fact provided, however, that if the defendant should not file exceptions, the plaintiffs would not do so. On April 28,1967, *586 the defendant filed a motion for minor revision of the trial commissioner’s report or for enlargement of time to file notice of intention to except under Rule 59. Thereafter, the parties notified the court that should the minor revision requested by the defendant be made, the commissioner’s report, findings of fact, and recommended conclusion of law would be acceptable. Since the court agrees with the commissioner’s findings of fact, opinion and recommended conclusion of law, revised and modified as requested by the defendant and accepted by the parties, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiffs are, therefore, entitled to recover and judgment is entered for plaintiffs with the amount of recovery to be determined in further proceedings pursuant to Rule 47(c).
OPINION OF COMMISSIONER *
Evans, Commissioner:
These actions were consolidated for trial on the issue of liability, reserving determination of the amount of recovery, if any, for further proceedings. Each of the corporate plaintiffs seeks recovery of income taxes and deficiency interest assessed and paid for the years 1960 and 1961 under the accumulated earnings tax provisions of the Internal Revenue Code of 1954. On the basis of the ultimate finding of fact (finding 12) that each corporation has proved by a preponderance of the evidence that it was not formed or availed of to avoid income tax with respect to shareholders, each of the plaintiffs is entitled to recover. United States v. Duke Laboratories, Inc., 337 F. 2d 280 (2d Cir. 1964).
Findings of Fact
1. (a) These actions, consolidated for trial on the issue of liability[1] arise under the Internal Revenue laws of the United States[2] to recover income taxes and interest collected from the plaintiffs on behalf of the defendant by the District Di *587 rector of Internal Revenue for Wilmington, Delaware (hereinafter referred to as the District Director).
(b) Halby Chemical Company, Inc., a Delaware corporation,[3] is hereinafter referred to as Chemical, while Halby Products Company, Inc., likewise a Delaware corporation,[4] is referred to as Products.
Accumulated Earnings Deficiencies
2. (a) On or before March 15, 1961, Chemical filed with the District Director its Federal corporate income tax return for the calendar year 1960. That return showed taxable income of $128,232.96 and income tax liability of $61,181.14. The amount of $31,181.14 of such tax liability was paid at the time of filing the return, and an additional payment of $30,000 was made on or before June 5,1961.
(b) On or before March 15,1962, Chemical filed with the District Director its 1961 corporate income tax return. That return showed taxable income of $117,938.33 and income tax liability of $55,749.38. The amount of $30,749.38 of such tax liability was paid at the time of filing, and a further payment of $25,000 was made on or before June 8,1962.
(c) In connection with the audit of Chemical’s 1960 and 1961 Federal income tax returns by the office of the District Director, representatives of that office determined a deficiency in tax based on the assertion that Chemical was subject to the accumulated earnings tax as provided by section 531 of the Internal Revenue Code of 1954. Said determinations were set forth in a letter from the District Director dated October 11,1963, and in a statutory notice of deficiency issued by the Acting Commissioner of Internal Revenue on September 3,1964. Except for minor adjustments in taxable incomes with which Chemical agreed, the sole basis for deficiencies determined by the Internal Revenue Service with respect to Chemical’s 1960 and 1961 income tax liabilities was the assertion by the Internal Revenue Service of accumulated earnings tax under said section 531.
*588 (d) On September 29,1964, Chemical paid to the District Director the asserted deficiencies in the total amount of $37,970.59, representing the following:

(e) Chemical timely filed with the District Director claims for refund of 1960 and 1961 Federal income tax and deficiency interest based upon asserted overpayments, resulting from the imposition of the accumulated earnings tax as set forth above. More than 6 months after the filing of such refund claims, the representatives of the Internal Revenue Service had not acted on such claims. The petition in this court was filed on June 7,1965. Thereafter, on June 15,1965, Chemical signed a waiver of statutory notification of claim disallowance.
3. (a) On or before March 15, 1961, Products filed with the District Director its Federal corporate income tax return for the calendar year 1960. That return showed taxable income of $126,786.44 and income tax liability of $60,404.69. The amount of $30,404.69 of such 1960 tax liability was paid at the time of filing the return, and an additional payment of $30,000 was made on or before June 2,1961.
(b) On or before March 15, 1962, Products filed with the District Director its 1961 corporate income tax return. That return showed taxable income of $92,667.45 and income tax liability of $42,560.85. The amount of $22,560.85 of such tax liability was paid at the time of filing the return, and a further payment of $20,000 was made on or before June 8, 1962.
(c) In connection with the audit of Products’ 1960 and 1961 Federal income tax returns by the office of the District Director, representatives of that office determined a deficiency in tax based on the assertion that Products was subject to the accumulated earnings tax as provided by section 531 of the Internal Revenue Code of 1954. Said determinations were set forth in a letter from the District Director dated *589 October 11,1968, and in a statutory notice of deficiency issued by the Acting Commissioner of Internal Revenue on September 3, 1964. Except for minor adjustments in taxable incomes with which Products agreed, the sole basis for deficiencies determined by the Internal Revenue Service with respect to Products’ 1960 and 1961 income tax liabilities was the assertion by the Internal Revenue Service of accumulated earnings tax under said section 531.
(d) On September 29,1964, Products paid to the District Director the deficiencies asserted, as set forth above, in the total amount of $35,587.48, representing the following:

(e) Products timely filed with the District Director claims for refund of 1960 and 1961 Federal income tax and deficiency interest based upon asserted overpayments, resulting from the imposition by the Internal Revenue Service of the accumulated earnings tax provided by section 531 of the Internal Revenue Code, as set forth above. More than 6 months after the filing of such refund claims, the representatives of the Internal Revenue Service had not acted on such claims. The petition in this court was filed on June 7, 1965, and on June 15,1965, Products signed a waiver of statutory notification of claim disallowance.
Chemical and Products as One Enterprise
4. (a) H. Albert Beekhuis was graduated from the University of California in 1923 with a bachelor of science degree in chemistry. Thereafter, in 1926, he obtained a doctor of philosophy degree from Yale University, based on graduate study in chemical engineering.
(b) After 1 year’s'employment by Jones & Laughlin Steel Corporation as a research metallurgist, he moved to Allied Chemical & Dye Corporation (now known as Allied Chemical Corporation) where he worked for 19 years as a research *590 chemist. Twenty years after completion of Ms academic training, be left Allied Chemical (in 1946) to venture on his own.
(c) Halby Chemical was founded as a partnership in 1946. Incorporation followed in 1947. Throughout its existence it has been actively engaged in the manufacture of chemical specialties (primarily tMocyanates) for sale to other manufacturers of chemicals, principally in relation to agriculture, such as fertilizers, herbicides, and insecticides.
(d) During the years in issue (1960-1961), as well as before and after, Mr. Beekhuis[5] owned 2,150 shares of the 2,700 shares of Chemical stock, while the remaining 550 shares were held by members of Ms family.[6] Mr. Beekhuis was president and treasurer of the corporation and the only stockholder active in its management.[7]
(e) Six years after founding Chemical, Mr. Beekhuis founded Products (in 1952), also as a partnership, to engage in the manufacture of chemical specialties requiring processes similar to those of Chemical, but intended for marketing in the cosmetic manufacturing industry. The incorporation of Products followed in 1955.
(f) During the years here in issue, as well as before and since, Mr. Beekhuis owned 1,600 shares of the 2,000 shares of Products stock, wMle 400 shares were owned by members of his family.[8] Mr. Beekhuis was president and treasurer of the corporation and the only stockholder active in its management, except for part-time work by his daughter, a management consultant.
(g) Chemical owned a 2-acre plant site and buildings in Wilmington, Delaware, which it shared with Products. While Chemical owned the realty, Products had its own manufacturing equipment. The two corporations shared a research and development division. Neither company held *591 patents on the products manufactured by it. Both companies concentrated upon the manufacture of relatively few products (eschewing diversification into more products in the interest of efficiency of operations) for sale in specialized, limited, and highly competitive markets.
The Beekhuis Dividend Policies
5. (a) From the outset of these ventures, neither Mr. Beek-huis nor the members of his family who were minority stockholders had need of dividends from the business as money to live on. During the years in issue, when both corporations were established and growing, Mr. Beekhuis received relatively modest salaries: $15,000 from Chemical; $12,000 from Products. The earnings of Chemical were permitted to accumulate without any dividend distribution whatever from 1947 through 1955. The year 1956 marked the first dividend distributions, when each of the corporations paid $1 per share, for a total of $4,700 out of combined earnings far in excess of that amount.
(b) The dividend record of the taxpayer corporations for the period 1957 through 1964[9] is shown in Table 1, incorporated herein by reference.

*592 (c)The net income retained (after taxes) by the two corporations during the same period is shown in Table 2, incorporated herein by reference.

(d) Tables 1 and 2, when read together, show that over the 8-year period Chemical earned $579,062.43, from which it paid out in dividends $58,725 and retained $520,337.48, while Products earned $565,869.45, paid out $42,000 in dividends and retained $523,869.45. Considered together, the two companies earned $1,144,931.93, paid out $100,725 in dividends, and retained $1,044,206.93.
(e) Mr. Beekhuis gave as his reason for retention of the lion’s share of the corporate earnings as surplus his belief that judicious use of the money by the corporations would produce greater values for himself and the other stockholders than any of them could provide for themselves through outside investment of dividend distributions. He indicated further that his family — the minority stockholders — agreed with him. Results, in terms of the growth of the companies, confirm the validity of his judgment.
(f) By way of dramatizing the effect of the corporate policies of nondistribution of the lion’s share of their earnings to stockholders, defendant placed in evidence a pro forma computation of the differences in income taxes payable by Mr. and Mrs. Beekhuis in 1960 and 1961, if Chemical and Products had distributed in full their current earnings for those *593 years. Instead of tlie income tax paid by them, for 1960, in the amount of $12,907.60, and for 1961, in the amount of $11,237.87, they would have paid, for 1960, $77,163.06, and for 1961, $60,861.84. According to the pro forma computations, therefore, Mr. and Mrs. Beekhuis have escaped[10] payment of $113,879.43 in income taxes.[11]
The Use of the Accumulations
6. (a) The effects of retention of earnings after limited distribution of dividends are illustrated by the growth of the companies in terms of earned surplus, as set forth in Table 3, incorporated herein by reference.

(b) Table 4, incorporated herein by reference, shows the ratios of total assets to earned surplus. In each instance the ratios are, generally, on a slowly descending scale, denoting a slowly ascending scale of the ratios of earned surplus to total assets.
(c) Table 5, incorporated herein by reference, shows the ratio of current assets to current liabilities. In this instance the ratios fluctuate, without a discernible pattern up or down,

*594

although seldom below 3 to 1 and usually higher, averaging above 4 to 1.
(d) Table 6, incorporated herein by reference, shows the total sales of each company, the net income after taxes, and the ratio of such net income to the sales dollar.
Chemical’s sales, as shown by Table 6, made a substantial increase in 1958 over 1957 and then remained relatively constant for 4 years (through 1962), after which sizable gains were recorded for 1963 and again for 1964, when sales passed the $1 million mark.

*595

Products’ sales, on the other hand, fluctuated, suffering a sharp drop in 1958 as compared to 1957, but recovering dramatically in 1959, only to suffer declines in 1960 and 1961, after which dramatic gains were again recorded in 1962 and 1963, and subjected to an equally sharp drop in 1964.
In each company, the net income per sales dollar remained relatively constant, except for Chemical’s rather poor showing in 1958. The 8-year record for the two companies suffices to indicate that earnings of 10 cents per sales dollar might reasonably be anticipated.
(e) The following conclusions are reasonably to be drawn from the statistics contained in Tables 1 through 6:
(1) That each of the taxpayer corporations limited its dividend distributions in the interest of retaining earnings for future use to the extent of 90 percent or more, in terms either of the 2 years in issue or the 8-year period covered by the tables.
(2) That the accumulated earnings were used in an effort to promote growth, which effort was, on the whole, successful.
(3) That each of the taxpayer corporations consistently maintained a high degree of liquidity.
*596 Taxpayers’ Justification of the Accumulations
7. (a) Taxpayers’ Protest[12] following the Thirty Day Letter incorporated statements theretofore made[13] “being in each case a statement of the grounds and facts to show the basis thereof on which the taxpayers rely to establish that no part of their earnings and profits have been permitted to accumulate beyond the reasonable needs of the business.” Each statement was verified by Mr. Beekhuis, who also said in his opening statement that the accumulations in each instance “are probably inadequate to the needs of the business.”
(b) Each taxpayer’s statement asserted four grounds (being the same for each taxpayer) for the necessity to accumulate surplus: (1) to provide working capital; (2) to provide for other capital needs; (3) to meet competition; and (4) to guard against hazards and emergencies.
The essence of the asserted need (as contained in taxpayers’ statements) to accumulate surplus to provide working capital was, in each instance, that current assets should be available to provide for inventory, accounts receivable, and cash needs (wages, salaries, et cetera) in amounts equivalent to 10 percent of anticipated annual sales for each category, being a total of 30 percent of annual sales.[14]
Capital needs (for other than working capital) were defined in taxpayers’ statements in terms of productive capacity, operating efficiency, research and development, and expansion of plant.
Taxpayers’ competitive positions were described in their statements in terms of the companies’ being “relative infants” as compared to their “giant competitors” in the manufacturing of chemicals, wherefore severe competition in the limited fields of their activities could be disastrous without adequate reserves with which to survive a financial crisis.
*597 The taxpayers’ statements defined the hazards and emergencies of their businesses in terms of (1) the enduring possibility of a disastrous fire or explosion, with consequent crippling effects on production facilities and the further possibility of large damage claims and (2) the inadequacy of available insurance to cover such contingencies.
(c) Each of the foregoing needs was described in taxpayers’ statements in brief detail as to each of the corporations. The evidence presented by taxpayers at the trial of these actions reflects an elaboration of the supporting detail given in their section 534 statements (incorporated, as heretofore noted, in their Protest of the 30-day letter).
The Issue as to the Reasonable Needs of the Business
8. (a) Just as the Internal Revenue Service rejected taxpayers’ contentions that their earnings and profits had not been accumulated beyond the reasonable needs of their businesses, within the terms of the statutes[15] and applicable Treasury regulations,[16] defendant now defends these actions on similar grounds.
(b) Emphasizing the fact that these cases turn on determinations made by the Internal Revenue Service concerning the adequacy in each instance of the taxpayer’s reserves at the 1959 year end and as a gauge by which to measure the reasonable needs of the businesses for 1960 and 1961, defendant has presented voluminous and detailed statistical tabulations of the taxpayers’ positions for the 3-year period 1959-1961 as well as for the 8-year period 1957-1964.
(c) On the basis of these statistical analyses, defendant would have the court conclude (1) that the determination by the Internal Revenue Service as to the adequacy of taxpayers’ reserves at year end 1959 in relation to their needs for 1960 and 1961 was reasonable, wherefore under the regula *598 tions[17] retained earnings of 1960 and 1961 may not be considered as having been retained for the reasonable needs of the business; (2) that the fact that earnings and profits have been permitted to accumulate beyond the reasonable needs of the business is determinative of the purpose to avoid the income tax with respect to shareholders [18] unless (3) the corporations by the preponderance of the evidence shall prove to the contrary,[19] and (4) that the taxpayers in these cases have not met that burden of proof.
Clarification of the Issues
9. (a) Following is the statement of the issue (or issues) in these cases upon which counsel agreed at pretrial:
* * * the sole issue * * * [is] whether, during the years 1960 and 1961, the taxpayer was formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting its earnings and profits to accumulate instead of being divided and distributed. Subsidiary to that issue is the issue whether during the years involved the earnings and {irofits of the plaintiff have been permitted to accumuate beyond the reasonable needs of the business.
(b) Under section 533 of the Internal Eevenue Code, “* * * the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.”
(c) One of the Treasury regulations[20] contains the following:
* * * The existence or nonexistence of the purpose to avoid income tax with respect to shareholders may be indicated by circumstances other than the conditions specified in section 533. Whether or not such purpose was present depends upon the particular circumstances of each case. * * *
*599 (d) A further provision[21] follows:
* * * The Commissioner may determine that the taxpayer was formed or availed of to avoid income tax with respect to shareholders through the medium of permitting earnings and profits to accumulate. In the case of litigation involving any such determination * * *, the burden of proving such determination wrong by a preponderance of the evidence, together with the corresponding burden of first going forward with the evidence, is on the taxpayer under principles applicable to income tax cases generally. * * * [T]he existence of * * * an accumulation [of earnings and profits beyond the reasonable needs of the business] is * * * determinative of the purpose to avoid income tax with respect to shareholders unless the taxpayer proves to the contrary by the preponderance of the evidence.
(e) Under both the statutes and the regulations the taxpayer’s burden of proving by the preponderance of the evidence “to the contrary” refers to “the purpose to avoid income tax with respect to shareholders” and not to accumulations beyond the reasonable needs of the business.
(f) “Whether or not such a purpose was present depends upon the particular circumstances of each case.” If the purpose was not present, and the taxpayer so proves by the preponderance of the evidence (after first going forward with the evidence) under principles applicable to income tax cases generally, the existence or nonexistence of an accumulation of earnings beyond the needs of the business is not determinative.
(g) It is concluded that the taxpayers in the instant cases have met the requisite burden of proof and that neither of them, in permitting the accumulation of earnings and profits, had as its purpose the avoidance of income tax with respect to shareholders. The conclusion is drawn from the facts recited in succeeding findings.
Management Goals[22]
10. (a) Mr. Beekhuis began his venture in independent private enterprise after working for 20 years for large cor *600 porations. From the outset of his undertaking he studied the trade journals faithfully for such guidance as they might afford in relation to problems of management and finance as well as production and marketing. These journals, having greater access to information concerning larger companies than smaller ones, carried more analyses of the concerns of the larger companies than of the smaller ones.' Mr. Beekhuis had no comparable access to pertinent information relating to companies closer to the relative sizes of Chemical and Products. Moreover, with his plants located in Wilmington, Delaware, he was working under the shadow of Du Pont, the biggest one of all, and proximity alone had some effect upon his judgment.
(b) His assertion, in the taxpayers’ Protest, that his companies were in competition with the giants of the industry, is illustrative. It reflects, perhaps, a degree of rationalization. During the years in issue both Chemical and Products were, individually, within the range of $500,000 companies, along with many other companies of the same or lesser size engaged in the manufacture of organic and inorganic chemicals. Considering Chemical and Products as one enterprise, the business would still be in the $1 million category, whereas the giants of the industry were in the range of $50 million to $100 million in total assets. Nationalization or no, Mr. Beek-huis’ concept of his competition was warranted as a reasonable basis for judgment on the part of a prudent businessman confronted with the problems peculiar to his companies.
(c) His assignment of 30 percent of anticipated annual sales to cover working capital needs for inventory, accounts receivable, and cash requirements is likewise indicative of his conservative management goals. It is true, as pointed out by defendant, that in each of his companies manufacturing processes of the various products were completed in a matter of hours, inventory was turned over in 30 days, accounts receivable were collected promptly (with almost no losses through bad debts), wherefore the corporations’ need for working capital could have been provided on a cyclical basis (of 3 or 4 months) instead of being based on annual forecasts. One of Mr. Beekhuis’ cardinal principles, how- *601 ev.er, was to operate his companies without borrowed money. He had read (and was convinced) that companies such as Chemical and Products, of intermediate size, as they were becoming during the years in issue, could not rely upon obtaining venture capital from sources outside their own earnings. Such companies were too large for bank loans, considering the risks involved in the business, and too small for public stock subscriptions at reasonable cost. Here again Mr. Beekhuis had before him the example of Du Pont, which financed every risk venture with its own reserve capital.
(d)' This principle (of using earnings for venture capital) carried over into the financing of the capital needs of Chemical and Products for plant replacement and expansion, for ventures into new products and new markets, and for reserve for research and development (although Mr. Beekhuis had succeeded, during the years covered by the evidence, in holding research and development costs to amounts that could be expensed rather than charged to capital outlays).
(e) Although neither Chemical nor Products held patents on any of the chemicals they manufactured, Mr. Beek-huis was committed to the idea that greater efficiency in manufacturing operations could be obtained by concentrating upon the production of relatively few chemicals as against expansion into a greater number. This commitment, to which he adhered, resulted in greater risk from the standpoint of marketing than would have obtained if the number of products had been increased.
(f) Marketing was the area wherein the giant corporations posed the more serious threat to Chemical or Products. Any competing company, large or small, could on any day enter the market in competition with Mr. Beekhuis’ companies, offering the same or a similar product at a lower price, reflecting the result of chemical or engineering research. The very large companies, however, had the advantage of extensive and sustained research at great expense over a long period of time, plus the ability to move into quantity production on very short notice. The only hedge against such competition was to stay ahead of the industry or at least abreast of it in quality of product and in price.
*602 (g) In concentrating upon the manufacture of relatively few products, the taxpayer corporations faced two constant-threats to their marketing. One was forward competition as above described: surprise competition in quality or price or both. Such competition coming from one of the very large companies could have proved ruinous without plans to survive a financial disaster. The other threat is described in the evidence by the phrase backward integration, covering the situation wherein a customer for one of the taxpayers’ products might decide to establish the manufacture of the product within its own plant, thereby destroying a portion of taxpayers’ market. This, too, could bring on a severe financial crisis while the affected taxpayer either found a new market or got into production with a new chemical.
(h) The determination to survive disaster or near-disaster from competition, from whatever source and in whatever form it might come, was one of three primary reasons for Mr. Beekhuis’ policy of accumulating earnings and profits to provide a reservoir of capital.
(i) The second reason was likewise defensive. It was directed toward the possibility of disaster by fire or explosion. Each of the companies manufactured one or more products containing ingredients of a volatile nature, subject to possible fire or explosion or both. Mr. Beekhuis’ reasoning was that (1) while fire insurance (which his companies carried) would cover the standard loss of buildings and machinery, it would not cover the cost of new and improved machinery; (2) business interruption insurance, as written (which his companies did not carry), was inadequate to his needs in the event of serious loss; and (3) a serious fire or, particularly, a bad explosion, might result in heavy damage claims, as to which, ostensibly, he preferred to be, in part, at least, a self-insurer.
(j) The third and final reason for the policy of accumulating earnings and profits was to cover the normal and increasing needs of capital for investment in plant, equipment, and inventory, as the companies grew and expanded. As a research chemist in his own right, Mr. Beekhuis was *603 continually exploring the potentials (of both manufacturing and marketing) of new products and processes, suitable for either Chemical or Products.[23] The use of reserve capital was necessary for new ventures or for expansion of the old.
(k) As part of his plans, Mr. Beekhuis emphasized his belief that any major new product or project he might get into would and should be as large as or larger than any one of the operations he had under way in either company.[24] In his testimony at the trial, he described numerous projects which he had explored or was exploring, many of which had not been actually undertaken or were not in immediate prospect of being undertaken. On the other hand, some of his plans for expansion had come to fruition in 1964 and 1965. Considering his method of operation, it is reasonable to conclude that such plans were under development in 1960 and 1961.
(l) At the time of trial, Mr. Beekhuis was approaching retirement age. Under questioning as to his hopes and plans for the companies if and when his guidance might no longer be available, he testified that his efforts were directed toward continuance of the two companies as going concerns; that three members of his staff were in training to take over his duties — one as a business executive, one as a chemical engineer, and one as a mechanical engineer; and that if ever the time should come when his interests or those of his family had to be disposed of, greater value would be realized from the sale of the businesses as going concerns than from liquidation.
(m) Mr. Beekhuis further testified that when he and members of his family (with whom, he said, he had con suited) made the decisions about the restrictions of dividends and the accumulations of profits and earnings, he was aware of and gave consideration to the statutory provision impos *604 ing a tax upon undistributed earnings. His thought, he said, was that the amount of the assets available to the companies was not in excess of that needed to carry on the business, to provide money for diversification, and to take care of new projects which were then in the laboratory.
Conclusion
11. The purposes of each of the taxpayer corporations, throughout the years reviewed in the preceding findings, in permitting the accumulation of earnings and profits, were: (a) to survive (1) the vicissitudes of competition and (2) physical disaster, if it should befall and (b) to achieve steady and substantial growth.
Ultimate Finding
12. Each of the taxpayer corporations, after having first gone forward with the evidence, has proved by a preponderance of the evidence under principles applicable to income tax cases generally, that it was not formed nor was it in 1960 and 1961 availed of, through the medium of permitting earnings and profits to accumulate, to avoid income tax with respect to shareholders.
Conclusion of Law
On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that each of the plaintiffs is entitled to recover, and judgment is entered to that effect. Pursuant to Pule 47 (c), the amount of the recovery will be determined in further proceedings.
In accordance with the opinion of the court, memorandum reports of the commissioner and stipulations of the parties, it was ordered on July 27,1967, that judgments for the plaintiffs be entered as follows:
Case No. 185-65_$37,970. 59
Case No. 186-65_ 35, 587.48
with interest as provided by law.

The memorandum opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

 Reserving determination of the amount of recovery, if any, for further proceedings.

 Specifically, sections 531-537 of the Internal Revenue Code of 1954 (accumulated earnings).

 Organized July 2,1947.

 Organized July 1, 1955.

 As a businessman Mr. Beekhuis appears to have dropped his degree title of doctor.

 Mrs. Beekhuis held 50 shares. Miss Jeanne B. Beekhuis (daughter) owned 100 shares. One brother and his wife held 100 shares, while another brother and his wife owned 200 shares, and a sister and her husband held the remaining 100 shares.

 Except for part-time service by Miss Beekhuis, a trained management consultant.

 Mrs. Beekhuis owned 40 shares. The daughter had 80 shares. A brother and his wife held 100 shares, while one sister owned 100 shares and another sister and her husband had 80 shares.

Much of the statistical data upon which the parties have relied is concentrated in this 8-year period, representing 3 years before and 3 years after the 2 years in issue. Statistics relating to the development of the companies in years prior to and after the years in issue are considered pertinent to the ultimate determination of the relationship of the years in issue to a stated course of conduct.

The computations are, as stated, pro forma. There is no issue here of either tax avoidance or tax evasion by Mr. and Mrs. Beekhuis.

 The total of the accumulated earnings tax on the corporations (excluding deficiency interest) was $62,060.63.

 Filed November 20,1963.

 Filed June 27,1963, pursuant to section 534.

 Reference is made to Table 6, where annual sales are tabulated. Assuming anticipation of sales in such amounts (and taxpayers’ estimates were usually somewhat overoptimistie), the application of 30 percent to each year’s sales will illustrate taxpayers’ needs for working capital as determined by Mr. Beekhuis.

 Sections 531-587, Internal Revenue Code of 1954 (Title 26, united States Code, 1964 ed.). See also sections 61, 561, and 565, and compare sections 269, 301, 302, 306, 337, 346, 482, 541 — 545, and 1551. Defendant’s brief (beginning at page 106) contains an excellent statement of the orientation of the accumulated earnings tax within the overall statutory framework of corporate and individual income taxation.

T.R. §§ 1.533 — 1 (a) (1) and (2) and 1.5.33-l(b) ; 1.535-3(b) (1) (ii) ; and 1.537 — 1(a) and (b)(1) and (2). These are all set forth in plaintiffs’ brief.

T.R. § 1.535-S(b) (I) (ii).

 Section 533.

 Id.

T.R.. i 1.533-1 (a) (2).

 T.R. § 1.533-1 (b).

 Inasmuch as taxpayers were closely held corporations, the tests of their purposes are more subjective than those applied to publicly held corporations.

 These ideas were not necessarily placed into research and development by the taxpayer corporations, at least not at once; they were instead held in reserve until needed for replacement or expansion.

 This devotion to the prospect for growth may have been the foundation of his belief, expressed in the taxpayers’ Protest, that the companies’ accumulations “are probably inadequate for the needs of the business.” Certainly, in terms of the operations he had under way in 1965 and 1966, his need: for capital with which to expand might quickly double or treble.