**INLAND OIL AND CHEMICAL CORPORATION**
**and**
**Inland Terminals, Inc.**
**v.**
**UNITED STATES of America.**
**Civ. No. 19870.**

United States District Court,
D. Maryland.
Feb. 9, 1972.

Shale D. Stiller, and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiffs.

Edward J. Snyder, Atty., Department of Justice, Washington, D. C. (Fred B. Ugast, Acting Asst. Atty. Gen., and Donald R. Anderson, Atty., Department of Justice, Washington, D. C., and George Beall, U. S. Atty., and Michael E. Marr, Asst. U. S. Atty., Baltimore, Md., on brief), for defendant.

THOMSEN, District Judge.

In this action, tried before the Court without a jury, Inland Oil and Chemical Corporation (Inland Oil) seeks recovery of accumulated earnings taxes [1] and interest thereon, assessed against and paid by it for the calendar year 1965 in the amount of $11,980.45. Inland Terminals, Inc., a wholly-owned subsidiary of Inland Oil, seeks recovery of similar tax-

es and interest assessed against and paid by it for the fiscal year ended August 31, 1965, [2] in the amount of $7,195.15.

The question presented with respect to each plaintiff is whether, during the relevant taxable year, it accumulated its earnings beyond the reasonably anticipated future needs of its business.[3]

*Facts* [4]

Many of the facts are stipulated, but plaintiffs called several witnesses, including Alfred R. Himmelrich, Sr., who with his sons owned all the outstanding shares of Inland Oil and constituted the board of directors of both corporations. The only business of Inland Terminals is to own and lease to Inland Oil the real estate which the latter company occupies and the trucks which it uses.

The business of Inland Oil was begun as a proprietorship by Himmelrich, Sr., in 1926, and was incorporated in 1952. At First, Inland Oil engaged primarily in the compounding and sale of lubricating oil. In the 1930's that business deteriorated, because of a change in the policies of the major oil companies, and Inland Oil began selling commercial gasoline. That market was curtailed by gas rationing during World War II, and Inland Oil was again forced to shift its product line.

From the end of World War II until 1965, the sale of petroleum solvents to the paint and dry cleaning industries was Inland Oil's principal business. Its major petroleum solvent product was mineral spirits, which was used as a thinner for alkyd (oil) base paints, and was also used, under the name "Stoddard Solvent", by dry cleaners. Inland

---

1. Provided for by § 531 et seq., I.R.C. 1954.

2. For convenience, the taxable year of each company will be referred to as 1965, and subsequent taxable years will be similarly referred to.

3. Plaintiffs agree that they did not need their accumulated earnings for current working capital requirements, and accept,

as they must, the decision in United States v. Donruss Co., 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969), on the issue of purpose.

4. Rulings have been made on elaborate proposed findings of fact submitted by plaintiffs. If there is any conflict between those findings and the statement of facts herein, the statement in this opinion is intended to control.

Oil purchased about 50% of its petroleum solvents from the Shell and Humble oil companies, both of which competed with Inland Oil for the same customers, but gave resellers a "voluntary allowance", which could be withdrawn at any time. A change in Humble's marketing procedures in 1965 resulted in a reduction by one-third of Inland Oil's gross profit margin on Humble products.

In the late 1950's, some of Inland Oil's competitors began selling chemical solvents, and in the early 1960's Inland Oil began to purchase and resell chemical solvents to some of its customers.

In 1964 and 1965, it was obvious to the directors of Inland Oil and to others that the paint industry was shifting from oil-base paints to water-base paints and that Inland Oil would have to offer its customers chemical solvents for use in coatings. The sale of mineral spirits by Inland Oil to paint manufacturers had fallen off by more than 50%.

At the same time the dry cleaning industry, Inland Oil's other major customer, was also changing. Before 1960, most dry cleaning was done by large urban laundries. With the population shift to the suburbs, the dry cleaning industry began to operate small "package stores". These stores stopped using mineral spirits because of the danger involved in their use, and switched to a nonflammable chemical solvent, perchlorethylene. Since about 1960 every new dry cleaning establishment has used perchlorethylene. The directors of Inland Oil were aware of this change in the dry cleaning business, as well as the changes in the paint industry. In 1964 and 1965 Inland Oil began to sell perchlorethylene more actively, and its directors went to New York to make arrangements to import that product.

Chemical solvents generally sell for $1.00–$1.75 per gallon, whereas petroleum solvents sell for $0.10–$0.20 per gallon.

In 1965 Inland Oil had taxable income of $92,187.90, on which the federal income tax was $39,250.18. It paid a dividend of $14,000, leaving $38,937.71 to be added to its accumulated earnings and profits of $247,525.36.

The similar 1965 figures for Inland Terminals were: taxable income $30,755.93; federal income tax assessment $4,781.65; no dividend paid; and $24,525.23 added to its accumulated earnings and profits of $98,729.02.

In 1965 the directors considered two alternative courses for the business:

(A) Diversification and expansion into the chemical solvent business, which would require a substantial outlay of cash, primarily because those products cost ten times more than petroleum solvents, and sales would generate a much higher total of accounts receivable;

(B) Purchase of another property, preferably on the waterfront, to relieve the overcrowding at the existing plant in Baltimore, where highly volatile solvents were stored close to a residential area, with the added possibility of opening a marine terminal facility at such new location.

They could pursue only one of these alternatives without going heavily into debt, which they did not wish to do.[5]

During 1965 Inland Oil engaged a real estate expert to look for a waterfront property suitable for a marine terminal and early in 1966 the directors discussed with the respective owners the possible acquisition of several such properties. They also obtained estimates of the cost of duplicating the plant at a waterfront location. The directors decided, however, that they would have to buy and sell greater quantities of relatively expensive chemical solvents, and that they could not afford both to do that and to move the plant to a waterfront location.

---

5. Plaintiff's policy had been to borrow only for short term needs, and not for expansion or diversification. This policy was dictated by the narrow profit margin of the business, and by the fact that to a large extent Inland Oil had existed at the sufferance of its major suppliers.

At the end of 1965 Inland Oil had $360,000 in cash and Treasury Bills and $268,000 accounts receivable.[6] Its directors did not have in mind at that time a specific amount by which the accounts receivable would increase as a result of the change in the product line, but they knew the increase would be very substantial.

In the event, the amount of Inland Oil's accounts receivable increased every year from 1965 through 1969, from $268,000 at the end of 1965 to $603,000 at the end of 1969, and the cash and Treasury Bills decreased from $360,000 to $118,000. On June 30, 1970, the last date on which either side offered any figures, Inland Oil's accounts receivable were up to $866,000, its cash and Treasury Bills were down to $10,000, and it had a bank loan of $50,000.

The large increase in accounts receivable was attributable to normal growth and to the relatively high price of the chemical solvents sold by Inland Oil during that period. The cash and Treasury Bills were used only for Inland Oil's business purposes; no stock was redeemed.

Inland Terminals' situation was somewhat different. Its only income consisted of rentals received from Inland Oil as lessee of its property and motor vehicles; the amount thereof was controlled by the owners of Inland Oil. Inland Terminals had $58,000 of cash and Treasury Bills at the end of its 1965 taxable year; that figure rose to $81,000 during the next year (1966), and then decreased gradually to $25,000. At the end of its 1966 year the figure was still $71,000. A small piece of real estate was bought for between $1,000 and $2,000; a tank was installed for $30,000; new autos, trucks and trailers were purchased; and bulk storage equipment was built. The total book cost of motor vehicles increased from $109,000 in 1965 to $218,000 in 1969, bulk storage equipment from $76,000 to $111,000, and buildings from $23,000 to $70,000.

The directors knew in 1965 that more expensive trailers would be needed for chemical solvents, and estimated they would cost $100,000. But no evidence was offered with respect to rates of depreciation, rentals, or purchase arrangements, contemplated or actual. All purchases of trailers and other equipment have been financed solely by Inland Terminals from the rental income it receives from Inland Oil. Inland Oil has not, independent of its rental payments, considered funding the purchase of the additional rolling stock.

Inland Oil paid dividends in 1963, 1964 and 1965. Inland Terminals has never paid a dividend.

### Discussion

The applicable statute and regulations are well known and have been recently discussed by the Fourth Circuit and by this Court. In Bahan Textile Machinery Co., Inc. v. United States, 453 F.2d 1100 (4 Cir. 1972), Judge Sobeloff, speaking for the Court, said:

"In assessing the 'reasonable needs of the business,' account must be taken not only of immediate, day-to-day business needs but also of 'reasonably anticipated needs of the business.' I. R.C. § 537. However, the corporation is by no means given a blank check to accumulate earnings indefinitely for future plans which are without substance. Oklahoma Press Publishing Co. v. United States, 437 F.2d 1275 (10 Cir. 1971). Speaking to this point,

---

6. Inland Oil's only loan receivable to an officer during 1965 was an item of $1,177.-74. This arose when a corporate credit card was used for a personal item, which was charged back to the officer as a loan receivable.

In 1965, the largest account receivable, between $50,000 and $60,000, was owned by a company which had changed ownership several times, which was paying its bills slowly, and whose owners in 1965 did not inspire confidence in Inland Oil.

The entrance into the chemical business and the consideration of a new plant site were not motivated in any way by income tax considerations.

section 1.537–1(b) of the Treasury Regulations on Income Tax (1954 Code) declares:

"'[T]he corporation must have specific, definite and feasible plans for the use of such accumulations * * *. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.'"

In an earlier case, Judge Sobeloff, speaking for the Court, said that "the size of the accumulated earnings and profits or surplus is not the crucial factor; rather, it is the reasonableness and nature of the surplus." Smoot Sand & Gravel Corp. v. C. I. R., 274 F.2d 495, at 500 (4 Cir. 1960). See also, Fenco, Inc. v. United States, 234 F.Supp. 317 (D. Md.1964), affirmed 348 F.2d 456 (4 Cir. 1965); Schenuit Rubber Co. v. United States, 293 F.Supp. 280 (D.Md. 1968).

The Congressional Committee Reports[7] stated that § 537—

"will make clear that there is no requirement that the accumulated earnings and profits be invested immediately in the business so long as there is an indication that future needs of the business require such accumulation. In any case where there exists a definite plan for the investment of earnings and profits, such corporation need not necessarily consummate these plans in a relatively short period after the close of the taxable year."

As Judge Sobeloff noted in *Bahan*, the Treasury Regulations on Income Tax, 1954 Code, § 1.537–1(b) require that the corporation "have specific, definite and feasible plans for the use of such accumulation". Such needs may not be merely "subsequently declared intentions" or

an "afterthought" to justify challenged accumulations of surplus. *Smoot*, supra; *Fenco*, supra; and KOMA, Inc. v. C. I. R., 189 F.2d 390 (10 Cir. 1951).

"* * * Courts, however, must not blind themselves to the realities in this age of rapid technological change. The product of today is frequently outmoded tomorrow. The results of research in the electronics, pharmaceutical and chemical fields alone justify this statement. Nor is it always possible for a company in advance to set aside a specific sum to achieve a specific goal. Comments made in the past to the effect that a definite plan actually followed through must be on the company's books and records before moneys assigned thereto become anticipated needs may have to be appropriately qualified in particular cases." Electric Regulator Corp. v. C. I. R., 336 F.2d 339, 345–346 (2 Cir. 1964).

■ Whether a taxpayer's earnings and profits were permitted to accumulate beyond the reasonable needs of the business, including the reasonably anticipated needs of the business, cannot be determined solely on the testimony of its directors. But their justification for the accumulation should be given serious consideration if it is credible and supported by the surrounding circumstances. See Kerr-Cochran, Inc. v. C. I. R., 235 F.2d 121, 124 (8 Cir. 1958).

### Inland Oil

■ It is true that the directors of Inland Oil did not decide in 1965 whether they would use their accumulated earnings for the expansion of their chemical solvents business or for the purchase of a new site, with the added possibility of developing a marine terminal facility. They knew in 1965 that the falling off of their sales of mineral spirits to the paint and dry cleaning industries would require them to do one or the other. The developments during the

---

7. H.Rep. No. 1337, 83d Cong., 2d Sess., p. 53, p. A173 (3 U.S.C. Cong. & Adm. News, pp. 4311–4312); S.Rep. No. 1622, 83d Cong., 2d Sess., p. 69, p. 318 (3 U.S.C. Cong. & Adm. News, p. 4958).

next year or two proved that they would need their accumulated earnings to finance the growth of their chemical solvents business, and they reluctantly abandoned the possibility of moving the plant. The fact that the business would have to use all or substantially all of its accumulated earnings as of the end of 1965 for one or the other of those business needs was clearly evident in 1965. Their foresight has been justified. Practically all of those accumulated earnings have been so used. There have been no loans to stockholders, payments to relatives, or the like, which were present in the *Bahan* case and in many of the other cases where the tax has been imposed. This Court is satisfied that Inland Oil did not accumulate its earnings during 1965 beyond the reasonably anticipated future needs of the business.

This conclusion is supported by the reasoning of many cases,[8] and when the facts are considered and compared, is not contrary to the teaching of most of the cases cited by the government.[9]

The government has noted that in its protest, filed in 1967, Inland Oil referred to its investigation of the cost of relocating its plant and other possible needs, and did not refer to the expansion of its chemical solvents business. Counsel for Inland Oil stated during argument why he prepared the protest in this way, and offered himself for cross-examination. The Court has considered the wording of the protest in weighing the credibility of the testimony of witnesses. It is not conclusive, and the Court is satisfied that the true facts are those set out above.[10]

### Inland Terminals

The facts with respect to Inland Terminals are different. It is a wholly-owned subsidiary of Inland Oil; its income and expenses are determined by the owners of Inland Oil; it has spent only a relatively small amount for real estate and improvements thereon during the years after 1965; it has had to buy more expensive motor vehicles, and that fact was probably known in 1965; but, as noted above, no evidence was offered with respect to depreciation, rentals, or purchase arrangements, contemplated or actual. All purchases of trailers and other equipment have been financed solely by Inland Terminals from the rental income it receives from Inland Oil. Inland Oil has not, independent of its rental payments, considered funding the purchase of the additional rolling stock.

Although a parent corporation may under appropriate circumstances ac-

8. In addition to the Fourth Circuit and District of Maryland cases cited in the text, see Dahlem Foundation, Inc. v. United States, 405 F.2d 993, 1003 (6 Cir. 1968), citing *Smoot*; Electric Regulator Corp. v. C.I.R., 336 F.2d 339, 345–346 (2 Cir. 1964) ; Adolph Coors Company, 27 T.C.M. 1351 (1968) ; Faber Cement Block Co., 50 T.C. 317 (1968) ; Hardin's Bakeries, Inc. v. Martin, 293 F.Supp. 1129 (S.D. Miss.1967) ; Mohawk Paper Mills, Inc. v. United States, 262 F.Supp. 365 (N.D.N.Y. 1966) ; Buffalo Batt and Felt Corp. v. United States, 64–2 U.S.T.C. ¶ 9724 (W. D.N.Y.1964) ; Oman Construction Co., Inc., 24 T.C.M. 1799 (1965) ; Alma Piston Co., 22 T.C.M. 948 (1963) ; John P. Scripps Newspapers, 44 T.C. 453, 469 (1965) ; Carolina Rubber Hose Co., 24 T.C.M. 1159 (1965). See also General Smelting Company, 4 T.C. 313 (1944) ; National Yarn Corp., 9 T.C.M. 610 (1950) ; Central Motors, Inc., v. Commissioner, 13 T.C.M. 781 (1954).

9. Henry Van Hummell, Inc. v. Commissioner, 364 F.2d 746 (10 Cir. 1964) ; Motor Fuel Carriers, Inc. v. United States, 322 F.2d 576 (5 Cir. 1963) ; Dixie, Inc. v. C.I.R., 277 F.2d 526 (2 Cir. 1960) ; KOMA, Inc. v. Commissioner of Internal Revenue, 189 F.2d 390 (10 Cir. 1951).

10. The Court has also considered plaintiffs' evidence and argument with respect to the hazardous nature of the business and the difficulty of obtaining certain types of insurance, but does not believe that those facts and argument would justify the accumulations in this case. Cf. Halby Chemical Co., Inc. v. United States, 180 Ct.Cl. 584 (1967). Nor does the Court accord much weight to plaintiffs' argument based on competition from its suppliers. See Motor Fuel Carriers, Inc. v. United States, 244 F.Supp. 380 (N.D.Fla.1965).

cumulate earnings for the reasonable needs of a subsidiary, a subsidiary may not ordinarily accumulate earnings for the needs of its parent.[11]

No sufficient reason appears in this case why Inland Terminals should not have declared a dividend in fiscal 1965. The rate of tax thereon would have been very small.

---

11. See Treasury Regulations § 1.537–3(b).